**David ARAZIE, Paul Karinsky, William Klein, et al., Plaintiffs–Appellants,**

v.

**Robert E. MULLANE, Paul J. Johnson, William E. Chandler, et al., Defendants–Appellees.**

No. 92–3667.

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1993.

Decided Aug. 17, 1993.

Henry A. Brachtl, Goodkind, Labaton & Rudoff, Jeffrey Squire, Kaufman, Malchman & Kirby, New York City, Terry Rose Saunders, Susman, Saunders & Buehler, Marvin A. Miller, Patrick E. Cafferty, Miller, Faucher, Chertow, Cafferty & Wexler, Chicago, IL, Mark C. Gardy, Lee Squitieri, argued, Abbey & Ellis, New York City, Michael D. Craig, Schiffrin & Craig, Buffalo Grove, IL, for plaintiffs-appellants.

Barbara S. Steiner, Jerold S. Solovy, William D. Heinz, argued, C. John Koch, Patricia A. Bronte, Norman M. Hirsch, Jenner & Block, Chicago, IL, for all other defendants-appellees.

Dennis J. Block, Joseph S. Allerhand, Darla C. Stuckey, Weil, Gotshal & Manges, New York City, for Bally Mfg. Corp.

Before BAUER, Chief Judge, CUMMINGS and MANION, Circuit Judges.

BAUER, Chief Judge.

In this appeal we consider whether the district court properly denied the plaintiffs' motion to amend their complaint. The court

concluded that the proposed amended pleading failed to cure the defects which led to the dismissal of the original complaint. We affirm.

### I. Facts

The plaintiffs, David Arazie, Paul Karinsky, William Klein, Ann Klein, Aldo Mirizzi, Lawrence Moss, Florence Moss, Kevin O'Sullivan, Jeffrey Starr, and Arthur Yorkes ("the stockholders" or "the plaintiffs"), purchased stock in defendant Bally Manufacturing Corporation between February 24, 1990 and October 11, 1990 ("the class period"). The stockholders brought this action against Robert E. Mullane, Paul J. Johnson, Patrick L. O'Malley, William E. Chandler, Roger N. Keesee, and Bally Manufacturing Corporation alleging that the defendants made fraudulent statements about Bally's financial status during the class period. They allege that Bally and some of its officers and directors (the other name defendants) (collectively "Bally") painted an unjustifiably rosy picture of Bally's financial health. In fact, they contend, the defendants' painting was so exuberant, it amounted to fraud in violation of the federal securities laws. The complaint alleged a cause of action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) & 78t(a), and the SEC's Rule 10(b)(5), 17 C.F.R. 240.10b–5. According to the stockholders, the defendants' fraudulent misstatements artificially increased the prices the stockholders paid for their Bally stock. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 241–44, 108 S.Ct. 978, 988–90, 99 L.Ed.2d 194 (1988) (discussing fraud-on-the-market theory); *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 510 (7th Cir.1989) (same).

The district court dismissed the first complaint because the statements that the plaintiffs complained of fall within the safe harbor for predictive, forward-looking statements provided by Exchange Act Rule 3b–6. 17 C.F.R. § 240.3b–6. The plaintiffs argued that these statements were not protected by Rule 3b–6 because they lacked a reasonable basis in fact. The court found that the plaintiffs failed to satisfy the requirements of Fed.R.Civ.P. 9(b) that fraud be pleaded with

particularity. "Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud." *DiLeo v. Ernst & Young,* 901 F.2d 624, 628 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). We require plaintiffs in securities cases to plead the circumstances showing fraud in detail—the "who, what, where, when, and how." *Id.* at 636 Plaintiffs must provide enough information about the underlying facts to allow us to distinguish their claims from those of disgruntled investors. The district court ruled that the plaintiffs failed to allege specific facts showing Bally's public predictions were fraudulent. It dismissed the first complaint. *In re Bally Mfg. Sec. Litig.,* 141 F.R.D. 262 (N.D.Ill. 1992).

The plaintiffs filed a motion to clarify the judgment to indicate whether they had leave to amend the complaint, or, in the alternative, to vacate the judgment under Fed. R.Civ.P. 60(b) and grant leave to amend under Rule 15(a). Plaintiffs filed a proposed amended complaint. Count one of the amended complaint alleged a cause of action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) & 78t(a), and the SEC's Rule 10(b)(5), 17 C.F.R. 240.10b–5; count two alleged common law fraud and deceit; count three alleged common law negligent misrepresentation. The court clarified its judgment, indicating that it did not grant leave to amend, and further denied the motion to vacate and leave to amend. *In re Bally Mfg. Sec. Litig.,* 144 F.R.D. 78 (N.D.Ill.1992). The court found that the amended complaint also failed to satisfy the requirements of Rule 9(b). The plaintiffs appeal the district court's denial of their motion to amend.

We review the facts alleged in the amended complaint to determine whether the district court's finding that it fails to satisfy the requirements of Rule 9(b) is correct. *See* Proposed Second Consolidated Amended & Supplemental Class Action Complaint, Appellants' Appendix at 230 ("Amended Complaint").

Bally's primary operations, fitness centers and casino hotels, require substantial capital investment. During 1987, 1988, and 1989, Bally invested heavily in property, equipment, and new acquisitions—to the tune of more than $800 million. *In re Bally,* 141 F.R.D. at 264. These investments were highly leveraged. By the end of 1989, Bally's $1.77 billion debt reflected 75% of its capitalization. In September 1990, Bally's stock price dropped precipitously after the firm announced it would not pay scheduled debt payments and dividends. The stockholders allege that during the class period, Bally's stock prices were kept artificially high by false statements and material omissions in Bally's public statements and SEC filings about its financial status. Amended Complaint at ¶ 80. The statements, according to the stockholders, failed to disclose an imminent cash crunch which threatened Bally's viability as a going concern. Amended Complaint at ¶ 1.

The complaint catalogues Bally's public statements between February and October 1990, and compares these statements to some of Bally's internal memoranda. Bally's internal memos and "reasonable projections" (based on data released in Bally's public statements), the stockholders argue, show that Bally's public statements were fraudulent because they omitted material facts. The allegedly fraudulent statements fall roughly into four categories. The first group concerned Bally's use of cash from its New Jersey casino subsidiary. The plaintiffs claim that the manner in which Bally obtained cash from this subsidiary should have been disclosed because it revealed Bally's desperate liquidity problems. The second group of statements concerned Bally's general failure to disclose what plaintiffs term a "looming liquidity crisis," particularly with regard to Bally's offer to swap debt instruments for common stock. The plaintiffs argue that Bally misleadingly portrayed the swap as a plan to "increase shareholder value." Amended Complaint at ¶ 47. They contend Bally should have announced that the swap was designed to cure severe liquidity problems. The failure to reveal the "true" nature of the swap made Bally's predictions of its future performance fraudulent. These problems, they believe, should have been disclosed. The third group of statements concerned the general success and competitiveness of Bally's casino and fitness center operations. Plaintiffs argue that Bally understated the effect of new entrants in the casino market and overstated the revenues its casinos and fitness centers would generate. The final group of statements concerned a range of topics, and are grouped together because they were issued in the weeks just prior to the drop in Bally's stock. We will review each group of statements, and the plaintiffs' allegations that certain internal documents contradict these statements and predictions about Bally's financial health.

## A. Cash from New Jersey Casinos

Bally announced its fourth quarter and year-end financial figures for 1989 on February 23, 1990. The stockholders highlight the following statement issued by Bally and quote Chairman of the Board and CEO, defendant Robert Mullane, who announced the figures:

> [W]e are well positioned to meet the needs of our markets as we move into the '90s.... Despite the recent decline of gaming industry stocks, I feel our previously reported strong cash flow position of approximately $7.00 per share after interest and taxes will reflect favorably on the company's long-term financial and stock market performance.

Amended Complaint at ¶ 38. Shortly after the year-end financial figures were released, in March 1990, Mullane told *Crain's Chicago Business,* that "[Bally] is a good business that's not being sold well on Wall Street.... I've done a very poor job of selling the company[,] .... We're going to start some selling. We have to. We have a better company than we've been showing." *Id.* at ¶ 39. These statements were misleading according to the stockholders because they did not disclose Bally's reliance on cash it received from its New Jersey casino subsidiary. This infusion, the stockholders claim, revealed Bally's weak financial position. They allege that Bally's position was so weak that it was willing to risk violating New Jersey's casino regulations.

To understand the basis for this accusation, we must briefly review the history of Bally's New Jersey casino operations. New Jersey requires casino operators to renew their licenses every two years. As part of that review, operators submit financial data to establish their financial stability. The Casino Control Commission conducted a discretionary review of Bally's financial stability when Bally renewed its license in spring 1990. According to the stockholders, one reason for the review was Bally's receipt of a $50 million loan from the Park Place, one of its Atlantic City casinos.

Bally filed an application for refinancing of the Park Place with the New Jersey gaming authorities in 1989. The application did not project the $50 million loan to the parent corporation in April 1990. Because the loan was unexpected, the Casino Commission allegedly concluded after its 1990 financial review that Bally "was experiencing, in the spring of 1990, an urgent need for substantial support" from Park Place which it had not previously disclosed to the Commission. Amended Complaint at ¶ 37. The amended complaint does not identify the source of this language; it is also unclear when the conclusion was reached or whether it was announced publicly.

Historically, Bally used cash generated by its Atlantic City casinos to service its own debt, and debt from its Nevada casinos. The stockholders allege the defendants knew by late 1989 that New Jersey's Casino Control Commission had prohibited dividend upstreaming without prior regulatory approval. Amended Complaint at ¶ 33. According to the stockholders, the prohibition was a condition of the Commission's approval of Bally's application to refinance the Park Place in 1989. *Id.* The stockholders do not refer to any documentary or other support for the assertion that such a prohibition existed when the loan was extended. They also do not explain why the alleged prohibition on dividend upstreaming extended to loan transactions.

The stockholders further contend that the Casino Commission's conclusion required Bally to disclose at this time that it needed cash urgently. *Id.* The $50 million loan was discussed in Bally's Park Place Inc.'s SEC Form 10–Q second quarterly report. The report, which was dated August 14, 1990, states that the "Advance" was made in April and was payable on demand. The report also states that Park Place had "no intention of requesting payment" and was not actually collecting interest. *See* SEC Form 10–Q Quarterly Report at 6, Appellees' Appendix at 146. Despite their allegations that the loan was "prohibited," "deceptive," and evidence of an "urgent need for substantial financial support," *see* Amended Complaint at ¶ 33, 34, & 39, nowhere in the complaint do the stockholders allege that the Casino Commission informed Bally that the loan was forbidden, invalid, or had to be refunded either before or after its review of Bally's financial status.

The stockholders also allege, somewhat confusingly, that the Park Place loan and the New Jersey Casino Commission's conclusion that Bally was in "urgent need" of cash deprive the company's February and March 1990 statements (that it was a "good company," "well positioned to meet the needs of our markets,") of a reasonable basis. The loan was requested in April, and the regulatory commission reviewed Bally's financial status after that. The transaction and the Commission's conclusion, because they had not yet occurred, could not have been disclosed in February and March.

According to the stockholders, other statements were also fraudulent because they failed to disclose the cash infusion from the Park Place casino. In its 1989 Annual Report to shareholders, distributed on March 27, 1990, Bally stated that:

The Company believes that its cash from operations, together with cash expected to be available under various lines of credit, credit agreements ... and capital transactions will be adequate to meet all of its cash requirements, including debt service.

*Id.* at 41. This statement was repeated in Bally's SEC Form 10–Q Report for the second and third quarters of 1990. The stockholders contend these statements were fraudulent or "at least without any reasonable basis" because the defendants knew they could no longer upstream dividends

from their New Jersey casinos, and because the Casino Commission was investigating the $50 million loan. Again, the Annual Report was issued before the loan transaction. The stockholders assert that the 1989 Annual Report should have stated that Bally was planning to meet its cash requirements "through the use of a prohibited loan transaction." *Id.* at ¶ 42. The stockholders also assert that the 1990 quarterly reports issued in March and August 1990 should have disclosed that the loan was a prohibited transaction, and were fraudulent because they did not.

### B. Debt Service and the Stock–for–Debenture Swap

The stockholders provide another basis for their allegation that Bally's prediction in the 1989 Annual Report that it would be able to meet its obligations with its existing cash flow lacked a reasonable basis. The stockholders complain Bally failed to warn investors of its "looming liquidity crisis." Amended Complaint at ¶ 50. They contend that, "given its year-end and first quarter results, reasonable projections for Bally's cash·flows showed that Bally would be unable to service its debt or continue to pay a dividend to the common stockholders in the very near future...." Amended Complaint at ¶ 51. Further, the stockholders allege, (1) the fitness centers were generating less cash than in prior years because of a change in the way the centers sold memberships; (2) competition from new casinos was hurting Bally's gaming operations to the extent that "reasonable projections for Bally's operations" showed "little chance" that Bally could meet its cash requirements, Amended Complaint at ¶ 51;[1] (3) Bally's "available cash and cash equivalents" were declining;[2] (4) Bally's debt covenants restricted certain subsidiaries from distributing funds to Bally and the level

of the restrictions increased in the first quarter of 1990;[3] (5) Bally's total debt increased in the first quarter, as did its debt due within one year;[4] (6) Bally's unused lines of credit decreased by approximately half during the first quarter of 1990; and (7) Bally posted larger losses in the last quarter of 1989 than it did in the last quarter of 1988 and posted a smaller net income in the first quarter of 1990 than it did in the first quarter of 1989.[5] Most, if not all of these fact are included in Bally's public statements. *See, e.g.,* SEC Form 10–Q for quarter ending March 31, 1990, Appellants' Appendix at 100–103.

The stockholders take issue with a press release the company issued on April 27, 1990 announcing its first quarter performance:

> Operating income for each of our three lines of businesses showed an increase over the first quarter of 1989.
>
> \*　\*　\*　\*　\*　\*
>
> Such first-quarter operating results reinforce my confidence that 1990 will reflect the benefits of the repositioning of the company during the 1980's....

Amended Complaint, ¶ 50. The stockholders contend that the defendants knew these statements were false and misleading when they were made because they did not address Bally's "looming liquidity crisis." *Id.* It's not that the figures are wrong—they contend that it was fraudulent for Bally not to disclose "by at least April 1990" that it hired an investment banker. *Id.* at ¶ 43. The investment banker was to develop a plan to enable Bally to comply with the financial covenants contained in some of its debt instruments. These covenants required Bally, among other things, to maintain a certain tangible net

---

1. The stockholders do not explain what 'reasonable projections' would have shown, or even how they should have been prepared.

2. Bally's Annual Report shows the decline in cash and cash equivalents from $101,626,000 in 1988 to $74,633,000 at the end of 1989. Annual Report at 26, Appellants' Appendix at 181.

3. The Annual Report states:
   Under various debt agreements, certain subsidiaries are restricted from paying cash dividends or other distributions to the parent com-

pany. Amounts so restricted were approximately $528.8 million at December 31, 1989. Annual Report at 20, Appellants' Appendix at 175.

4. Bally's first quarterly report includes its debt figures. See Appellees' Appendix at 60–61.

5. The net income figures appear in Bally's first quarterly report issued in March 1990. Appellees' Appendix at 61.

worth. The investment banker was hired to help, according to plaintiffs.

To reduce its debt and avoid default of the covenants, Bally offered a stock-for-debenture swap commencing on May 30, 1990. The stockholders allege that Bally misrepresented the nature of the stock-for-debenture swap. *Id.* at ¶ 46–47. Bally offered to exchange fifty-seven shares of common stock for every $1000 in principal of its 13.5/8% subordinated debentures. According to the investment banker, this exchange rate valued common stock roughly 32% above its current trading price. *Id.* The stockholders assert that this gap in the value of the common stock gave Bally incentive to lie about the reasons for the swap offer. In a press release, the company stated that the exchange was part of a plan "intended to increase shareholder value." *Id.* at ¶ 46. The stockholders allege that this statement was false, because the exchange was designed to alleviate Bally's severe liquidity problems. Public statements made by CEO Mullane also created a false impression, they argue. *Id.* at 47. Mullane told the *Chicago Tribune* on May 31, 1990 that Bally "chose to use stock rather than cash in the offer ... because it needed cash for various expansion projects this year." Amended Complaint at ¶ 47. Bally stated in its second quarterly report that the offer "was intended principally to reduce the company's debt and interest expense, thereby improving its cash flow, liquidity, and net worth." SEC Form 10–Q for period ending June 30, 1990, at 7, Appellants' Appendix at 125.

In addition to Bally's characterization of the swap, the stockholders complain about a statement made by Bally Chief Financial Officer Paul Johnson to *Crain's Chicago Business* in June 1990, defending Bally's debt load. Bally had been · receiving negative press about its financial health. Johnson argued, in defense of Bally's financial position, "that asset value is a better indicator of its [Bally's] health than its debt load." *Id.* at 52. Further, Johnson told *Crain's* that, "The debt is appropriate for Bally's business.... The reality is that its not too much debt; it's not beyond the capabilities of this company to manage." *Id.* The stockholders contend (without elaboration) that these statements

were false and misleading because Bally's debt was greater than it could manage. Amended Complaint at ¶ 52.

The stockholders take issue with yet another of Bally's responses to criticism in the press. In July 1990, Mullane responded to a "detailed analytic report" prepared by an analyst for Merrill Lynch expressing doubt that Bally could remain solvent through 1991. Amended Complaint at ¶ 53. Mullane denounced the report and said that "the report was so wrong. Something smells at the same time." *Id.* at ¶ 53–54. The complaint does not indicate where the statement appeared. Mullane accused Merrill Lynch of being out to get Bally to distract investors from Merrill Lynch's investment in Donald Trump's troubled Taj Mahal casino. Mullane said Bally had "excellent" prospects. *Id.* at ¶ 54. According to the stockholders these statements "misled investors regarding Bally's true financial condition ... which was such that Bally could not continue to fund the programs previously announced and service its debt and maintain its dividend." *Id.*

### C. Performance of Fitness Centers & Casinos

The stockholders find a third misrepresentation in Bally's 1989 Annual Report. They allege that the Report fraudulently described the performance of Bally's casino operations. Bally stated that its superior facilities in New Jersey and Nevada helped them to "compete successfully in their respective markets." Amended Complaint at ¶ 48. According to the stockholders, this statement lacked a reasonable basis in fact because Bally's internal memos "reflected the fact that the opening of Golden Nugget's Mirage had 'taken some of the patron base away.'" *Id.* at 48. Another memo "indicated that increased competition in Atlantic City from the Taj Mahal in April 1990, would cause a dramatic decline in table games revenue...." *Id.* The complaint does not indicate who wrote these memos, who received them, or when they were generated. Nevertheless, according to the stockholders, these two memos illustrate that none of Bally's favorable predictions about its casinos were reasonable.

The stockholders concede that Bally disclosed in its forecasts to the New Jersey Casino Commission that competition from a new casino in Atlantic City was hurting its Atlantic City casino. *Id.* at 49. We note that Bally's first quarter report also stated that competition in New Jersey and on the Las Vegas "strip" had increased, and affected performance negatively. The report also stated that "There can be no assurance that this opening [ (the Taj Mahal) ] or other casino hotel openings will not have a long term adverse effect on operating results at Bally's Park Place and Bally's Grand." SEC Form 10–Q for period ending March 31, 1990, at 7, Appellees' Appendix at 63. This statement also appeared in Bally's Annual Report (at 15, Appellants' Appendix at 170), together with an acknowledgement that competition in Las Vegas had also intensified. The stockholders also do not cite the lengthy analysis of casino revenues included in Bally's second quarterly report. SEC Form 10–Q for period ending June 30, 1990, at 11–13, Appellants' Appendix at 127–29. *Id.* at 48. The stockholders argue that Bally's statements about increasing competition were not adequate to dispel the false impression created by its statement that it believed its casinos could compete successfully.

The stockholders contend that they relied upon other "false" and "misleading" statements that Bally issued in July and August of 1990. *Id.* at 55–56. Mullane reported that Bally's income increased in 1990. He said that "operating profits before interest and taxes and before unusual and extraordinary items for the quarter were $71 million vs. $44 million for the same period in 1989. These favorable results reflect the strength of our basic business segments, each of which performed well in the quarter." *Id.* at ¶ 55. The plaintiffs have made no allegation that any of Bally's figures were false. Mullane stated that Bally's casinos were performing well despite the increase in competition. He also commented on the fitness centers: "The outstanding performance of our fitness center business reflects the major repositioning of that business during the past two years. We believe our investment will now yield substantial returns in the fitness center business." *Id.* at ¶ 56. These statements were

allegedly fraudulent because they again failed to disclose the "heightening liquidity crisis." *Id.* The stockholders complain that Bally did not mention that its "own internal forecasts indicated" that the new pricing system for fitness center memberships would decrease cash flow by roughly $20 million. *Id.* This was a material omission because Bally's internal documents provided that in order to avoid default of its corporate revolving loan, Bally had to maintain a cash flow of $149,569,000. The internal documents estimated a cash flow of only $146,057,000. The $20 million then, was significant.

Bally's second quarterly report also stated:

The Company believes that its cash from operations, together with cash expected to be available under various lines of credit, credit agreements ... and capital transactions will be adequate to meet all of its cash requirements, including debt service. In addition, as previously announced, the company is considering potential stock or asset sales with respect to a subsidiary.

*Id.* at ¶ 57. These statements were also false and without reasonable basis in fact, according to the stockholders, because the fitness centers were generating less cash, competition in the casino business was increasing, Bally's interest expenses were increasing, as was the company's total debt, and the company's lines of credit had decreased. In this section of the Amended Complaint, plaintiffs repeat their allegation that the second quarterly report was also fraudulent because Bally should have anticipated and revealed the New Jersey Casino Commission's judgment (based on the $50 million Park Place loan) that Bally urgently needed cash. The stockholders stress that "defendants also knew that [the Commission] believed that Bally's financial stability had already been stretched 'to its outer limits.'" *Id.* at ¶ 60.

D. The Final Flurry of Alleged Misrepresentations

According to the stockholders, Bally's "undisclosed liquidity crisis" was compounded by other undisclosed material events and peaked in September 1990. They claim that on August 31, Bally knew (but failed to disclose) that its Grand Casino in New Jersey would

lose a $10 million line of credit. On September 6, 1990, Bally agreed with New Jersey's casino regulators that Bally's New Jersey casinos would not make any further transfers of funds to Bally except in the ordinary course of business without the Commission's approval. *Id.* at ¶ 62. The stockholders assert that the agreement "virtually assured" Bally's default on its obligations. *Id.* The plaintiffs do not explain this assertion.

The stockholders also allege that the defendants were aware that "internal projections" showed Bally would violate the cash flow covenant in its revolving credit agreement by September 30, 1990. The stockholders do not identify or provide any further details about these alleged projections. The plaintiffs also contend that Bally officers Chandler and Johnson "received a memo which advised them that there were adjustments to the calculation of unrestricted retained earnings that, if recorded, would preclude the declaration of common dividends." *Id.* at ¶ 63. Again, the stockholders do not identify the memo's author or date, or the basis of the new calculations. Finally, the stockholders complain that Bally did not disclose that one of its revolving credit agreements forbade sending cash to its Nevada casino subsidiary. *Id.* at ¶ 64.

In response to an unusually high trading volume in Bally stock on October 2 and 3, 1990, the New York Stock Exchange asked Bally to explain the trading activity. Bally, in compliance with its standard policy, declined to comment. Bally's stock prices had fallen from $5-¼ per share to $3-¾ per share. The stockholders allege the prices fell because of rumors about Bally's "liquidity crisis."

Then, the stockholders assert, on October 7, 1990, Mullane finally admitted publicly "that Bally was experiencing a liquidity problem and that the dividend on its common stock was likely to be suspended despite earlier assurances that Bally's cash was sufficient. . . ." *Id.* at ¶ 66. The stockholders contend that this statement was inadequate because Mullane made false assurances in a subsequent statement. On October 11, 1990, Mullane stated: "We're not going bankrupt. If you ask if we have $50 million in extra cash, I'd say no. But if you ask whether we can pay our bills, the answer is yes. We've never missed a payment, and I don't foresee that we will." *Id.* at ¶ 67. The next day, Bally fired Mullane. The company announced that it would suspend payment of dividends and would not make a scheduled interest payment on its 11½% mortgage. Bally's stock prices dropped to $3-1/8. The high point for the stock during the class period was $10-5/8.

To sum up, the stockholders allege that throughout 1990 "operations were not generating and had no reasonable likelihood of generating sufficient free cash to service debt and to make principal payments when due." Amended Complaint at ¶ 74. They quote at length the company's public statements after the ouster of Mullane. These statements detail Bally's financial difficulties and inability to pay its debts on time after October 15, 1990. The stockholders include these statements to bolster their argument that Bally should have taken a red crayon to its rosy public image long before Mullane was fired.

## II. Analysis

We need not review the correctness of the district court's decision dismissing the first complaint because the plaintiffs' have not appealed it. On appeal is the district court's denial of the motion to file an amended complaint. This decision lies within the court's sound discretion. *Moore v. Indiana,* 999 F.2d 1125 (1993); *Midwest Grinding Co., Inc. v. Spitz,* 976 F.2d 1016, 1021 (7th Cir. 1992). Courts need not accept amended pleadings if they fail to cure the defects of the original. A district court does not abuse its discretion when it denies leave to amend where repleading would be futile. *DeSalle v. Wright,* 969 F.2d 273, 277 (7th Cir.1992) (district court properly refused to permit amendment when changes were irrelevant to claims); *J.D. Marshall Int'l, Inc. v. Redstart, Inc.,* 935 F.2d 815, 819 (7th Cir.1991).

We note briefly the difference between this standard and the standard of review for dismissal of a complaint under Federal Rules of Civil Procedure 12(b)(6) and

9(b). We review dismissals *de novo.* We accept all the factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff. *Mosley v. Klincar,* 947 F.2d 1338, 1339 (7th Cir.1991). We are not required, however, to ignore any facts alleged in the complaint that undermine the plaintiff's claim. *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992). The federal rules impose more stringent pleading requirements upon complaints charging fraud than on complaints charging other types of misconduct. Fed.R.Civ.P. 9(b). We outlined these requirements in *DiLeo v. Ernst & Young,* 901 F.2d 624, 626 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). In *DiLeo,* we held that plaintiffs must plead the circumstances constituting fraud in detail—the "who, what, when, where, and how...." *Id.* at 626. *See also Graue Mill Development Corp. v. Colonial Bank & Trust Co.,* 927 F.2d 988, 992 (7th Cir.1991) ("[P]arties pleading fraud in federal court, must state the time, place and content of the alleged communications perpetrating the fraud.") (citation omitted). Again, we emphasize the plaintiffs must provide enough detail about the underlying facts which illustrate that a firm's public statements were fraudulent to allow a court to evaluate the claim in a meaningful way.

Because the district court rested its decision to reject the amended complaint on 9(b), we briefly review the facts in *DiLeo* to demonstrate the level of specificity 9(b) requires. In *DiLeo,* the suit challenged the handling of Continental Bank's loan portfolio. 901 F.2d at 625. Continental got into financial trouble because its risky loans did not pay off. *Id.* at 626. According to the plaintiffs, the bank's reserves for problem loans were not increased quickly enough. The plaintiffs alleged that Ernst & Young (the Bank's accountants) "became aware that a substantial amount of the receivables reported in Continental's financial statements were likely to be uncollectible." *Id.* Because the accountants failed to make this awareness public, they were allegedly guilty of securities fraud. We found the complaint failed to satisfy the requirements of Rule 9(b) because it did not "give examples of problem loans that Ernst & Young should have caught, or explain how it did or should have recognized that the provisions for reserves established by Continental's loan officers were inaccurate." *Id.* at 626.

The district court in this case found that the stockholders failed to include the kind of detail we required in *DiLeo* in the amended complaint. We have reviewed the complaint, and agree with the district court's assessment. The burden placed on plaintiffs to plead fraud with particularity is designed to protect companies that have suffered business reverses from strike suits brought by disgruntled investors. *Id.* at 627, 628. ("Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.") (citing *Goldberg v. Household Bank, f.s.b.,* 890 F.2d 965 (7th Cir.1989); *First Interstate Bank v. Chapman & Cutler,* 837 F.2d 775, 780 (7th Cir.1988); *Denny v. Barber,* 576 F.2d 465 (2d Cir.1978) (Friendly, J.)).

We review the district court's denial of the plaintiff's motion to amend bearing in mind the standards for dismissing complaints under 9(b). We note also that the plaintiffs in this case do not contest that Bally's predictions of its future performance are protected if they had a reasonable basis.

## B. The Amended Complaint

The stockholders claim that defendants made false and misleading statements about Bally in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a), as well as Rule 10b–5, 17 C.F.R. § 240.10b–5. The securities laws encourage companies to make public predictions of future performance to assist investors in estimating a firm's future value. We discussed this policy, and the reasons behind it in our opinion in *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 513–14 (7th Cir.1989). *Wielgos* analyzed the protection offered by Rule 175, 17 C.F.R. 230.175, which was promulgated under Section 19(a) of the 1933 Act, 15 U.S.C. § 77s(a), and is an

analog to the rule at issue here. The protection applicable in this case is the safe harbor created for forward-looking statements by 1934 Exchange Act Rule 3b–6. 17 C.F.R. 240.3b–6.[6] A company's predictions of future performance are protected so long as they have a reasonable basis in fact—a poor prediction will not automatically subject a company to suits under the securities laws. *Wielgos,* 892 F.2d at 513–14. Indeed, as we have pointed out:

> If all estimates are made carefully and honestly, half will turn out too favorable to the firm and the other half too pessimistic. In either case the difference may disappoint investors, who can later say that they bought for too much (if the projection was optimistic) or sold for too little (if the projection turns out to be too pessimistic). Thus the role of a safe harbor: the firm is not liable despite error.

*Id.* at 514..

We considered a firm's prediction of its future performance in *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1418–19 (7th Cir.1992). Lands' End announced a "goal" of earning at least ten percent net pre-tax profits over the upcoming five-year period. *Id.* The firm failed to fulfill the prediction and investors sued, alleging that the stated goal lacked a reasonable basis. According to the investors, the statement was fraudulent because Lands' End "was experiencing operational problems of slackening demand, obsolete inventory, low-margin liquidations, and declining profit margins which prevented the company from achieving its earnings goals." *Id.* at 1418. The investors claim failed, however, because they failed to plead in detail the operational problems with sufficient particularity. The operational problems were alleged "only in the vaguest terms—Roots alleges, for example, that Lands' End 'failed to establish adequate reserves for its excessive and outdated inventory,' but nowhere does Roots allege what the company's reserves were or suggest how great the reserves should have been." *Id.* at 1419. The vague assertions, we held, failed to undercut the reasonableness of the defendants' public statements. *Id.*

The vague assertions about operational problems in *Roots,* and the allegations in *DiLeo* sound a lot like the stockholders' allegations in this case. For example, plaintiffs allege Bally became aware, or should have become aware, that the New Jersey Casino Commission might limit its ability to obtain cash from its casino in early 1990. Just as the *Roots* and *DiLeo* assertions lacked the necessary particularity, so the stockholders assertions lack the specific details required by Rule 9(b). The stockholders refer to no document, meeting, or transaction which

---

**6.** The pertinent sections of the rule provide:

(a) A statement within the coverage of paragraph (b) of this section which is made by or on behalf of an issuer ... shall be deemed not to be a fraudulent statement (as defined in paragraph (d) of this section), unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith.

(b) This rule applies to the following statements:

(1) A forward-looking statement (as defined in paragraph (c) of this section) made in a document filed with the Commission, in part I of a quarterly report on Form 10–Q, ... or in an annual report to share-holders..., a statement reaffirming such forward-looking statement subsequent to the date the document was filed or the annual report was made publicly available....

(c) For the purpose of this rule, the term *forward-looking statement* shall mean and shall be limited to:

(1) A statement containing a projection of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items;

(2) A statement of management's plans and objectives for future operations;

(3) A statement of future economic performance contained in management's discussion and analysis of financial condition and results of operations....

(4) Disclosed statements of the assumptions underlying or relating to any of the statements described in paragraphs (c)(1), (2), or (3) of this section.

(d) For the purpose of this rule the term *fraudulent statement* shall mean a statement which is an untrue statement of a material fact, a statement false or misleading with respect to any material fact, an omission to state a material fact necessary to make a statement not misleading, or which constitutes the employment of a manipulative, deceptive, or fraudulent device, contrivance, scheme, transaction, act, practice, course of business, or an artifice to defraud, as those terms are used in the Securities Exchange Act of 1934 or the rules or regulations promulgated thereunder.

could or should have alerted Bally that the Commission objected to the upstreaming of cash before the financial review and report following the $50 million loan. Although Bally executed a stipulation in September 1990 that there would be no other financial transactions with the New Jersey casinos outside the ordinary course of business, the stipulation is a far cry from the plaintiffs' charges that Bally's financial straits were so dire that it entered a forbidden or illegal transaction with its Park Place casino.

The plaintiffs have also failed to plead particular facts showing Bally's other allegedly fraudulent statements lacked a reasonable basis. They support their allegation that Bally knew it faced a 'liquidity crisis' in spring 1990 on the following assertions: "internal memos" predicted cash short falls and stiff competition; the company obtained a loan from a subsidiary and hired an investment banker to conduct a stock-for-debenture swap; and its fitness center subsidiary was generating less cash. The plaintiffs believe these facts show that all of Bally's forecasts about its ability to service its debt lacked a reasonable basis. Most of the statements the stockholders complain of are general predictions based upon released data. Indeed, the plaintiffs rely on the data in some instances to show that the predictions are unreasonable. Plaintiffs' references to unreleased or internal information that allegedly contradict the public statements are scanty. For example, as to the undisclosed "liquidity crisis," the plaintiffs allege that an internal projection of cash flow predicted that Bally's cash flow was $3.5 million short of the level required to avoid default on Bally's revolving debt in September 1990. Amended Complaint at ¶ 56. All the complaint says is "Bally's internal documents admitted. . . ." *Id.* It does not indicate who prepared the projected figures, when they were prepared, how firm the numbers were, or which Bally officers reviewed them. In paragraph 63, the plaintiffs allege that officers Chandler and Johnson "received a memo which advised them that there were adjustments to the calculation of unrestricted retained earnings that, if recorded would preclude the declaration of common dividends." Amended Complaint at ¶ 63. But

as the district court pointed out, the plaintiffs did not say who sent the memo, when it was received, or whether it reflected a final determination that cash flow would be inadequate. *See* 144 F.R.D. at 81.

We consider one remaining allegation which shares the flaws of those referring to the internal financial projections, and yet is more specific than most of those in the Amended Complaint. The plaintiffs claim in paragraph 48 that an internal memo stated that Golden Nugget's Mirage casino in Nevada "had taken some of the patron base away." No date, author, or addressee is indicated. Again, the "who, what, where, and when" are missing. Bally was aware of, and published in its quarterly reports, the effects of its restructuring of the fitness center operation and of competition on its casinos. The scanty descriptions of internal memoranda the stockholders provide do not undermine the foundation of Bally's public predictions of its performance, particularly given the extensive detail of its operations included in Bally's annual and quarterly reports. *Cf. Panter v. Marshall Field Co.*, 646 F.2d 271, 291–93 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (discussing circumstances when internal financial projections are appropriate for disclosure); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 530 (7th Cir.1985) ("The investor cannot ask a court to focus on the lie and ignore the remaining pieces of information already available to him (or, in the case of a publicly traded security, already available to others and reflected in the price of the security).").

These are the most specific, detailed allegations about unreleased information contained in the amended complaint. Like the plaintiffs in *In re First Chicago Corp Sec. Litig*, 769 F.Supp. 1444, 1453 (N.D.Ill.1991), the stockholders seem to "infer fraud" from the temporal proximity of the favorable reports with the inauspicious revelations of October 1990. As the court in *First Chicago* explained, however, temporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance do not create an inference that the earlier statements were fraudu-

lent. *Id.* "[F]raud by hindsight" is not actionable. *DiLeo,* 901 F.2d at 628. The gist of the situation seems to be that based on the data, the plaintiffs (through the 20–20 lens of hindsight), disagree with Bally's predictions based on known facts.

As we explained in *Wielgos,* predictions of future performance are inevitably inaccurate because things almost never go exactly as planned. 892 F.2d at 514. The safe harbor rules "assume[ ] that readers are sophisticated, can understand the limits of a projection—and that if any given reader does not appreciate the limits, the reactions of the many professional investors and analysts will lead to prices that reflect the limits of the information." *Id.* In other words, even if individuals over-estimate the significance of a public statement, the market price will accurately reflect a firm's value because it incorporates the judgments of all investors. We believe that Bally's public predictions of its future performance and its statements to the press, as alleged in the complaint, present a paradigm case of this phenomena. Bally released financial data, and made predictions based on the data. Market analysts released their own evaluations, which were reported in the press. Bally then responded to those predictions in another round of public statements. This back and forth exchange between the media and Bally continued until Bally revealed in October that it would not be making scheduled payments.

The facts plaintiffs have alleged indicate that there was considerable public difference of opinion over Bally's prospects. *See In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1114–15 (9th Cir.1989) (discussing impact of information from media sources on market price in suit alleging fraud-on-the-market theory), *cert. denied sub nom., Schneider v. Apple Computer, Inc.,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). But they have failed to allege any specific facts which illustrate that Bally's predictions lacked a reasonable basis. We have explained that, "If all estimates are made carefully and honestly, half will turn out too favorable to the firm and the other half too pessimistic." *Wielgos,* 892 F.2d at 514.

We agree with the district court's finding that the internal memoranda and projections that the plaintiffs cite do not indicate that Bally's public statements lacked a reasonable basis. Firms are not required to publish in-house estimates of their future performance. *Id.* at 516. "There is no evidence ... that the estimates were made with such reasonable certainty even to allow them to be disclosed to the public." *Panter v. Marshall Field Co.,* 646 F.2d 271, 291 (7th Cir.), (citing *Vaughn v. Teledyne, Inc.,* 628 F.2d 1214, 1221 (9th Cir.1980), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981)). In *Wielgos,* we ruled that internal projections still in the process of consideration and revision cannot serve as a basis for liability. The plaintiffs do not say who prepared the memos and projections, their dates, and in some cases who received the information. The plaintiffs here have even failed to allege that the memo containing the internal projection regarding retained earnings was generated and circulated during the class period, or that the projection was a final one. Such meager pleading cannot satisfy the standards we set out in *Wielgos.*

At bottom, we can find no specific allegations which reveal that Bally knew during the class period that there was no possibility that its cash flow would be adequate for its needs. Sophisticated investors are expected to "understand the limits of a projection." *Wielgos,* 892 F.2d at 514. The district court properly refused to permit the stockholders to amend their complaint. Bally's public statements fell within the safe harbor created by Exchange Act Rule 3b–6, and the plaintiffs have failed to allege with the particularity required by Fed.R.Civ.P. 9(b) that these statements lacked a reasonable basis.[7]

### III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

7. Because we find the plaintiffs' amended complaint fails to satisfy the requirements of Rule 9(b), we do not consider defendants' alternative

ground for dismissal—that they cannot be liable under Rule 10b–5 because they did not trade in Bally stock during the class period.