Diane **WEISBURGH,** on behalf of herself and all others similarly situated

v.

**ST. JUDE MEDICAL, INC.; William G. Hendrickson; Lawrence A. Lehmkuhl; Thomas H. Garrett, III; and Karl Mosch.**

No. 4–92–CV–638.

United States District Court, D. Minnesota, Fourth Division.

Nov. 18, 1994.

George F. McGunnigle, Jr., William L. Greene, Michael J. Wurzer, Leonard Street & Deinard, Minneapolis, MN, for defendants.

## ORDER

ROSENBAUM, District Judge.

In this action, the plaintiff, a corporate shareholder and putative class representative, alleges that the individually-named defendants—various officers and directors of St. Jude Medical, Inc. ("St. Jude" or "the company")—and the defendant corporation committed fraud by providing materially false and misleading information to St. Jude stockholders and market analysts, and by failing to disclose material facts concerning the company's financial status.

The defendants move to dismiss plaintiff's Second Amended Class Action Complaint ("Second Amended Complaint" or "Sec. Am. Comp.") for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."). Defendants argue that plaintiff has failed to allege fraud with particularity as required by Fed.R.Civ.P. 9(b); therefore, the Second Amended Complaint should be dismissed. The Court heard oral argument on February 16, 1994.

### I. *Background*

#### A. *The Parties*

Plaintiff, Diane Weisburgh, is a resident of Vermont. On January 29, 1992, she purchased 100 shares of St. Jude's common stock at $48.00 per share. St. Jude is a Minnesota corporation which manufactures and sells medical devices. Its stock is listed and traded on the NASDAQ stock exchange. Defendant William G. Hendrickson, a Florida resident, is chairman of St. Jude's board of directors. Defendant Lawrence A. Lehmkuhl, a Minnesota resident, is St. Jude's president, chief executive officer, and a member of St. Jude's board of directors. Defendant Thomas H. Garrett, III, also a Minnesota resident, is a member of St. Jude's board of directors. Defendant Karl Mosch, a Washington resident, is the president of St. Jude's cardiac assist division.

Russell J. Jensen, Jensen Law Office, St. Paul, MN, Stephen A. Whinston, Ivonia K. Slade, Berger & Montague, Philadelphia, PA, Dennis J. Johnson, Susan Schneider Thomas, Zlotnick & Thomas, Bala Cynwyd, PA, for plaintiff.

### B. *The Present Action*

On July 1, 1992, St. Jude issued a press release announcing that its expected second quarter earnings would fall between 49¢ and 52¢ per share, which was below the 54¢ to 56¢ per share growth projected by market analysts. In the same announcement, St. Jude expressed optimism that its performance for the remainder of the year would be consistent with its target of 15% sales and 20% earnings growth over the previous year's levels. (Sec.Am.Comp. ¶ 80.) Within 24 hours of the July 1, 1992, announcement, plaintiff filed her original class action complaint.[1] The putative class consists of all persons and entities, excluding the officers, managers, and president of St. Jude, who purchased St. Jude stock between December 17, 1991, and July 2, 1992 (the "class period"), and were damaged as a result of defendants' false and misleading statements to stockholders and market analysts. According to plaintiff, the class incurred damages as a result of paying artificially inflated prices for St. Jude stock in reliance upon defendants' fraudulent representations and the integrity of the market. (Sec.Am.Comp. ¶ 106.) The original complaint alleged that the defendants committed common law fraud, negligent misrepresentation, and violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (1981); Securities Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 (1991). On January 15, 1993, plaintiff filed an amended complaint and a motion for class certification.

On March 2, 1993, defendants filed their first motion to dismiss the Amended Class Action Complaint for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). Defendants argued that plaintiff failed to plead fraud with partic-

ularity as required by Fed.R.Civ.P. 9(b). On May 28, 1993, the Court denied defendants' motion to dismiss, but ordered plaintiff to further amend her complaint to plead fraud with particularity. Specifically, the Court ordered plaintiff to allege "who said what to whom, when, and under the circumstances which constitute the fraud...." *See* Record at 6, Civ. No. 4–92–638, (D.Minn. May 28, 1993).[2] The Court granted defendants leave to renew their motion to dismiss after the Second Amended Complaint was filed. Plaintiff filed her Second Amended Complaint on June 17, 1993, asserting the same statutory violations set forth in the original complaint. On June 28, 1993, defendants renewed their motion to dismiss, arguing that the Second Amended Complaint also failed to plead fraud with particularity. Plaintiff filed a second motion for class certification on October 8, 1993.

The Court must now determine whether plaintiff's Second Amended Complaint conforms with Fed.R.Civ.P. 9(b). The jurisdiction of this Court is premised upon Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. Plaintiff asks the Court to exercise its supplemental jurisdiction over her state law claims, pursuant to 28 U.S.C. § 1367(a).[3]

### C. *Class Action Allegations*

In her Second Amended Complaint, plaintiff alleges that defendants made: (1) unreasonably optimistic short-term projections concerning St. Jude's anticipated revenues and earnings growth; (2) unsubstantiated long-term projections regarding St. Jude's ability to sustain its growth absent an external acquisition; and (3) false or reckless statements about the domestic and international competition faced by St. Jude.

---

1. On that day, St. Jude stock closed at $31.50 per share, down $6.00 per share and $25.00 lower than its trading high during the relevant time period. (Sec.Am.Comp. ¶ 81.)

2. At the same hearing, the Court directed plaintiff's counsel to submit an *in camera* statement setting forth his reasonable inquiry and efforts to establish that the complaint was well-grounded in fact, pursuant to Fed.R.Civ.P. 11(b). *See* Record at 7. By Order, dated June 18, 1993, the Court determined that counsel had satisfied his

obligation to make a reasonable inquiry into the factual basis of the complaint prior to its filing.

3. Because the Court's jurisdiction is based solely on federal question grounds, the Court should not retain jurisdiction over plaintiff's state law claims if the federal claims are dismissed. 28 U.S.C. § 1367(c)(3). *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

Plaintiff claims that these statements and representations were designed to artificially inflate the market price of St. Jude's common stock so that the company could obtain inflated prices for any securities it chose to issue as part of its strategy to diversify its products by making an external acquisition. Defendants' conduct was also intended, according to plaintiff, to allow defendants to sell portions of their personal St. Jude stock at inflated prices, as well as to protect their executive positions and compensation which depended, in part, upon St. Jude's profitability. (Sec.Am.Comp. ¶ 13.)

Plaintiff contends that there was no reasonable basis for defendants' representations when made because: (1) defendants knew, or recklessly disregarded, that absent an acquisition or unexpected product sales, the company's long-term growth rate was closer to 12%, rather than the 15% to 20% projected; (2) St. Jude's international division encountered problems with a 1991 European marketing change from the use of distributors to direct sales, and faced increasing international competition from, among others, Carbomedics, Inc. ("CMI"), a company authorized by St. Jude to sell a mechanical heart valve substantially similar to St. Jude's valve; (3) St. Jude's internal monthly financial reports reflected below-budget performance by its international division throughout the fourth quarter of 1991 and the entire class period; and (4) in the domestic arena, St. Jude experienced increasing competition and decreasing growth due to its saturation of the market, improved marketing by its competitors, and Federal Drug Administration ("FDA") approval of two new tissue heart valves in September, 1991. (Sec.Am.Comp. ¶ 9.) Plaintiff further alleges that internal company reports revealed that, with the exception of February, 1992, St. Jude's domestic division reported sales below budget for each month of the fourth quarter of 1991 and throughout the class period. (Sec.Am.Comp. ¶ 9.)

In order to assess plaintiff's fraud allegations, it is necessary to understand the nature of St. Jude's business prior to, and during, the class period. During that time, St. Jude was essentially a one-product company, its primary business being the sale and manufacture of its mechanical heart valve. In 1991, approximately 93% of St. Jude's revenues were derived from these sales. (Sec.Am.Comp. ¶ 6.) In fact, during the same year, St. Jude sold approximately 46% of all heart valves purchased worldwide, 65% of the world's mechanical heart valves, and 85% of the mechanical heart valves marketed in the United States. (Sec.Am.Comp. ¶ 16.) During the class period, St. Jude owned the only commercially-available, FDA-approved, bi-leaflet heart valve sold in the United States. (Sec.Am.Comp. ¶ 15.) Long prior to the class period, market analysts urged St. Jude to make an external acquisition to diversify its products. (Sec.Am.Comp. ¶ 17.) Although management acknowledged a desire to diversify, no acquisition was made prior to, or during, the class period.[4]

## II. Analysis

In considering a motion to dismiss, the Court "must take the well-pleaded allegations of the complaint as true, and construe the complaint, and all reasonable inferences arising therefrom, most favorably to the pleader." *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir.1986). Having carefully reviewed the Second Amended Complaint, the Court finds that plaintiff's allegations of fraud fail to satisfy the requirements of Fed. R.Civ.P. 9(b).

Rule 9(b) requires that "all averments of fraud ..., [and] the circumstances constituting fraud ... be stated with particularity." *Id.* More specifically, Rule 9(b) requires that a complaint plead the "who, what, when, where, and how" of the alleged fraudulent conduct. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). The particularity requirement of

4. The Court notes that recently (some two years after the close of the claimed class period) the popular press reported that St. Jude is, in fact, making its first acquisition. Steve Alexander, "The Wait Is Over: St. Jude Announces Big Acquisition," *Star Tribune*, June 29, 1994, at 1D. *See also* Steve Alexander, "St. Jude Invests $2 Million in Company in California, Setting Stage for Acquisition," *Star Tribune*, August 17, 1994, at 1D, *as amended*, August 19, 1994.

Rule 9(b) is a marked departure from the general simplified pleading philosophy of the federal rules. *See TCF Banking and Sav., F.A. v. Arthur Young & Co.,* 706 F.Supp. 1408, 1411 (D.Minn.1988) (Magnuson, J.). This requirement has been strictly applied in the context of securities fraud litigation as a means of deterring frivolous suits. *See Id.; In re Lifecore Biomedics Inc.,* 159 F.R.D. 513 (D.Minn.1993) (Doty, J.); *DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2nd Cir.1987). In fact, Minnesota's federal courts have held that in the context of securities litigation, Rule 9(b) serves three distinct purposes:

> First, it deters the use of complaints as a pretext for fishing expeditions of unknown wrongs designed to compel *in terrorem* settlements. Second, it protects against damage to professional reputations resulting from allegations of moral turpitude. Third, it ensures that a defendant is given sufficient notice of the allegations against him to permit the preparation of an effective defense.

*TCF Banking,* 706 F.Supp. at 1411 (citing *Ross v. A.H. Robins, Co., Inc.,* 607 F.2d 545, 557 (2nd Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980)).

As set forth below, the Court finds that plaintiff's Second Amended Complaint fails to meet the Rule 9(b) standard.

### A. *Short–Term Growth*

Initially, the Court determines that plaintiff's claims that defendants misrepresented St. Jude's potential for short-term growth in 1992 revenues and earnings fail to plead fraud with particularity. At the beginning of the class period, defendants' public statements projected a 15% to 20% increase in 1992 revenues and earnings. According to plaintiff, defendants issued guidance to market analysts suggesting that the actual range would be closer to 20% to 25% earnings growth and 15% to 20% revenues growth.[5] (Sec.Am.Comp. ¶ 8.) Plaintiff claims that these projections were misleading and/or fraudulent because St. Jude's internal memoranda and financial reports indicated that its international division was experiencing problems with a marketing changeover in Europe.

In 1991, St. Jude changed to direct distribution, rather than the use of distributors, to market its mechanical heart valves in six European countries. Sales in these countries accounted for approximately 25% of St. Jude's worldwide mechanical heart valve sales. (Sec.Am.Comp. ¶ 18.) According to plaintiff, although defendants informed the market that this changeover had a short-term negative impact on St. Jude's 1991 quarterly results,[6] they indicated that the adverse effects of the changeover would cease once the distribution program was fully implemented.[7] (Sec.Am.Comp. ¶ 20.)

Plaintiff also alleges that defendants used St. Jude's "analyst hotline" to provide misleading and/or fraudulent guidance to market analysts about the company.[8] During the

---

**5.** This guidance to market analysts pertained to both revenues and earnings per share and was accomplished by directing analysts to an acceptable range of estimates. (Sec.Am.Comp. ¶ 22.)

**6.** During the first three quarters of 1991, St. Jude reported sales and earnings increases over the prior year's comparable quarters. Sales increases on a year-end basis were reported at 15%, 21%, and 20%, respectively. However, these results were below market expectations. (Sec.Am.Comp. ¶ 19.)

**7.** Plaintiff claims that defendants also informed analysts that: (1) St. Jude's future sales and profits would benefit dramatically once the company completed its European distribution changeover, which would permit it to capture a portion of the discounts it had previously given to distributors; (2) as a result of St. Jude's direct contact with surgeons, it would report an increase in the number of units sold; (3) pursuant to St. Jude's supply agreement with CMI, St. Jude would receive a 30% discount from CMI on the carbon components of its heart valves; and (4) in-house production of self-manufactured pyrolytic carbon components would significantly increase St. Jude's profit margins. (Sec.Am.Comp. ¶ 23.)

**8.** The analyst hotline was a service provided by St. Jude which allowed analysts to receive information regarding the company's net sales, gross margins, general and administrative expenses, research and development expenses, operating expenses, other income, and income tax rates for the most recently reported quarter, along with management's outlook on many of these items. (Sec.Am.Comp. ¶ 22.)

class period, analysts periodically published reports or recommendations and issued wire releases containing their opinions as to St. Jude's prospects. Stockbrokers would then disseminate the information to customers. These reports were regularly reviewed and considered by other firms and analysts. (Sec.Am.Comp. ¶ 22.) According to plaintiff, various analysts reports issued during the class period contained company-specific information about St. Jude and attributed certain growth projections and other indicia of the company's financial condition to St. Jude management. Plaintiff alleges that the substance of these reports, and the recommendations they contained, were significantly influenced by St. Jude management. As a result, plaintiff asserts that defendants had a duty to ensure that the forecasts contained in the reports were not misleading. (Sec.Am. Comp. ¶ 22.) According to plaintiff, defendants failed to correct misleading information and projections issued by analysts.

Plaintiff further claims that St. Jude's internal documents revealed increasing domestic competition and decreasing growth due to market saturation by St. Jude and FDA approval of two competing heart valves in September, 1991. Plaintiff argues that internal reports revealed that, with the exception of February, 1991, St. Jude's domestic division, which accounts for 60% of the company's net sales, reported below-budget sales during each month of the fourth quarter of 1991 and throughout the class period. Plaintiff argues that St. Jude's short-term growth projections were fraudulent and lacking in reasonable basis because defendants failed to take into account the effect of increased competition, making St. Jude's prior growth projections misleading. The Court finds that these assertions do not plead fraud with the specificity mandated by Rule 9(b).

The fact that a successful company faces competition does not, by itself, make the company's optimism about its future fraudulent. Plaintiff has not alleged that defendants did anything more than paint a flattering picture of St. Jude's numbers. Specifically, plaintiff refers to "no document, meeting, or transaction which could have, or should have, alerted [the defendants that

their short-term growth predictions were so overly-optimistic as to constitute fraud]." *See Arazie v. Mullane*, 2 F.3d 1456, 1466–67 (7th Cir.1993). Further, plaintiff has alleged no facts indicating that the internal documents revealed that St. Jude faced insurmountable obstacles to short-term growth or that the alleged impediments to St. Jude's projected growth would make such growth all but impossible. *See Id.* Certainly, St. Jude and the defendant officers faced day-to-day and quarter-to-quarter concerns regarding potential operating difficulties. After all, St. Jude is a large, international corporation. Any business plan offers predictions in gross; but no plan or projection can predict with absolute certainty the vagaries a company must confront. Business is not transacted on a smooth-operating conveyor belt or a perpetual "up" escalator. Here, plaintiff has failed to adequately allege facts indicating that defendants knew, or should have known, that their optimism about St. Jude's status had become misleading and/or fraudulent. "Such meager pleading cannot satisfy the [Rule 9(b)] standard...." *See Id.* at 1468; *Kowal v. MCI Communications Corp.*, 1992 WL 121378 (D.D.C.), *aff'd*, 16 F.3d 1271 (D.C.Cir.1994).

B. *Long Term Growth—Diversification*

■ Plaintiff next asserts that St. Jude's projections of continued growth absent an external acquisition constitute fraud. Plaintiff provides an exhaustive array of statements made by market analysts, and attributed to St. Jude management, concerning the company's proposed strategy to achieve long-term growth. (Sec.Am.Comp. ¶¶ 25, 31–33, 38–40, 44, 49, 53, 58, 60, 66, 69, 77, and 79.) According to plaintiff, defendants provided information to analysts which was designed to, and did in fact, lead the analysts to conclude that St. Jude would meet its long-term growth projections exclusively through its mechanical heart valve sales. (Sec.Am. Comp. ¶ 24.) For instance, on May 20, 1991, defendant Lehmkuhl projected that St. Jude would grow annually at a rate of 20% for the next few years and that the company expected to attain its long-term goals by increasing market penetration, reducing operating costs, and the savings caused by the Europe-

an distribution changeover. Lehmkuhl gave no indication that an acquisition would be necessary in order for St. Jude to maintain the projected 20% growth rate.[9] Plaintiff claims that this "omission," along with unspecified others, was a fraudulent attempt by St. Jude to imply that its long-term goals were attainable absent an acquisition. Plaintiff also insists that, based upon these types of "omissions" by St. Jude management, analysts issued reports suggesting that St. Jude would meet its annual growth projections without an external acquisition. As a result, plaintiff argues, the guidance provided to those analysts respecting St. Jude's long-term growth was fraudulent.

Here again, the Court finds that the Second Amended Complaint fails to plead fraud with particularity. Plaintiff does not specify the "who, what, where, when, and how" of defendants' alleged guidance to market analysts. In one instance, plaintiff claims that a particular investment firm based its conclusions about St. Jude's market share performance on "information believed to have been provided ... by the company." (Sec.Am. Comp. ¶ 29.) Plaintiff, however, entirely fails to specify which individual from St. Jude provided this alleged guidance. This Court will not hold defendants responsible for the projections of market analysts absent an indication that defendants were responsible for the projections or in a position to influence or control them. *See Raab v. General Physics Corp.,* 4 F.3d 286 (4th Cir.1993) (holding that a company cannot be held liable for an analyst's report where the complaint does not plead with any specificity the source of the analyst's information, how it was supplied, or how the company could have controlled its content). Plaintiff's failure to make specific allegations in this regard is fatal under Rule 9(b).

### C. *Competition*

■ Finally, as to plaintiff's third category of claims—that defendants made false or misleading statements regarding St. Jude's

competitor, CMI—the Court again finds that plaintiff has failed to fulfill the requirements of Rule 9(b). Prior to the class period, CMI was in the process of developing a tissue heart valve substantially similar to the one manufactured by St. Jude. In fact, near the beginning of the class period, the FDA accepted CMI's Pre-market Approval Application, a supposed milestone toward obtaining approval and a precursor to FDA review. (Sec.Am.Comp. ¶ 12.) During the class period, CMI engaged in clinical testing designed to win FDA approval of its valve. Plaintiff alleges that defendants' knowledge of the FDA's acceptance of CMI's pre-market approval application imposed upon St. Jude the duty to factor-in the effect of competition on St. Jude's growth projections. Rather than moderate their projections, however, plaintiff contends that the defendants led the market to believe that St. Jude would continue to enjoy its de facto monopoly in the United States mechanical heart valve market due to problems that CMI was having with its testing.

Here again, plaintiff has failed to set forth who said what to whom. Nowhere does plaintiff allege how or why St. Jude's alleged statements regarding CMI's clinical trials were false, or that defendants believed them to be so, or that defendants were reckless in making them. Plaintiff's Second Amended Complaint ultimately acknowledges, if only by implication, that CMI did experience some problems with the tests. (Sec.Am. Comp. ¶ 35.) Further, plaintiff fails to allege that information regarding the status of CMI's FDA testing was unavailable to the public, which might impose upon St. Jude the duty to publicize the status of CMI's clinical trials to shareholders and analysts. In fact, counsel for plaintiff admitted at oral argument that the information was indeed available to the public, it was simply difficult to locate.[10] The Court declines to adopt a rule which requires a company to broadcast otherwise public material simply because some interested party might wish to review it at some future date.

---

**9.** *See, supra,* note 4.

**10.** As counsel for the class acknowledged at oral argument, although not widely disseminated, this

information is publicly available in certain FDA "blue sheets."

III. *Conclusion*

In this Court's view, the unsupported and conclusory allegations in plaintiff's Second Amended Complaint are simply an effort to fashion a case of "fraud by hindsight." *See Kowal, supra,* at 6. But even in hindsight, plaintiff's claims are deficient—St. Jude met, and in fact exceeded, its projected sales and earnings growth for the year which encompassed the class period.[11] This Court joins with numerous others that have refused to infer fraud when a few sales and earnings projections paint a rosier picture of a company than internal company documents might otherwise suggest. *See DiLeo v. Ernst & Young,* 901 F.2d 624 (7th Cir.1990); *Arazie v. Mullane,* 2 F.3d 1456 (7th Cir.1993); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271 (D.C.Cir.1994). The fact that a company is optimistic about its future does not constitute an actionable promise that a quarterly "blip" will not occur. Optimism in the face of the inevitable "blip" does not equal fraud. Plaintiff has now had three bites at the proverbial apple and has still been unable to cobble a complaint which complies with Rule 9(b). The Court will not allow her another try. Having reached this conclusion, the Court denies, as moot, plaintiff's motion for class certification.

Accordingly, for the reasons set forth above, and based on the records, files, and proceedings herein, IT IS ORDERED THAT:

1. Defendants' motion to dismiss is granted. The Second Amended Complaint is dismissed without leave to amend.

2. Plaintiff's motion for class certification is denied as moot.

LET JUDGMENT BE ENTERED ACCORDINGLY.

11. St. Jude achieved its earnings goal for 1992 with a 21.5% increase in earnings over 1991.

(Sec.Am.Comp. ¶ 11.)