In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 05-4322

TRICONTINENTAL INDUSTRIES, LIMITED
and TRICONTINENTAL DISTRIBUTION, LIMITED,

*Plaintiffs-Appellants*,

*v.*

PRICEWATERHOUSECOOPERS, LLP,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 5526—**Elaine E. Bucklo**, *Judge*.

_____

ARGUED JUNE 7, 2006—DECIDED JANUARY 17, 2007

_____

Before BAUER, RIPPLE and WOOD, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Tricontinental Industries Limited
and Tricontinental Distribution Limited (collectively
"Tricontinental") instituted this action against
PricewaterhouseCoopers, LLP ("PwC"), for negligent
misrepresentation, common law fraud and securities
fraud. These allegations related to statements that PwC
had made regarding the financial worth of its client,
Anicom, Inc. ("Anicom") during negotiations involving the

sale of Tricontinental's assets for Anicom stock. The district court dismissed Tricontinental's original, amended and second amended complaints for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6), and for failure to plead fraudulent conduct with the specificity required by Federal Rule of Civil Procedure 9(b). Tricontinental timely appealed. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

### 1.

Because this is an appeal from a motion to dismiss, "[w]e accept all the factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff." *Arazie v. Mullane*, 2 F.3d 1456, 1465 (7th Cir. 1993) (citation omitted).[1]

Anicom, a wire distribution company, was founded in the early 1990s. Soon thereafter, its stock became publicly traded, and the company adopted a strategy to increase

---

[1] In the present case, there are two operative complaints from which we draw the facts. The Amended Complaint, *see* R.117, sets forth the operative facts with respect to Tricontinental's negligent misrepresentation claim and with respect to its claim of common law fraud concerning PwC's post-closing actions. The Second Amended Complaint, *see* R.135, sets forth the operative facts with respect to Tricontinental's claim for common law fraud based on PwC's pre-closing actions and with respect to Tricontinental's federal securities claim.

market share and to expand its geographical scope of operations. Between 1995 and 1997, Anicom acquired twelve companies. Each of these transactions involved some payment in the form of Anicom stock. During this time, PwC rendered accounting, audit and various types of consulting services to Anicom.

In September 1998, Anicom entered into an Asset Purchase Agreement ("Agreement") to acquire the wire and cable distribution assets of three companies—Texcan Cables Ltd. (known now as Tricontinental Distribution Limited), Texcan Cables, Inc. and Texcan Cables International, Inc.[2] According to the Agreement, Anicom acquired those assets in exchange for cash and Anicom stock.[3]

After the transaction, Tricontinental Distribution and Texcan Cables, Inc., transferred their stock to plaintiff Tricontinental Industries, Ltd., who was not a party to the Agreement.

### 2.

According to the allegations of Tricontinental's complaint, which we must accept as true for purposes of this appeal, in 1996, Anicom began engaging in improper accounting procedures to enable it to report that it had met sales and revenue goals. The procedures included

---

[2]  Anicom had approached one or all of the Texcan entities in both 1996 and 1997 concerning a possible merger, but nothing came of those discussions.

[3]  Texcan Cables International did not receive any Anicom stock in the transaction.

the use of fictitious sales orders or "prebill[s]" for goods that were not ordered. R.135 at 9. PwC became aware of these practices in July 1997 when it was asked to investigate Anicom's billing practices at Anicom's Atlanta and Tampa offices. After conducting its investigation, PwC reported to Donald C. Welchco, Anicom's then Vice President and Chief Financial Officer, that improper billing had occurred at Anicom branches and that, in the absence of controls, the practice might arise at other branches as well. *See id.* at 47.

No mention of these irregularities was made in PwC's audits of Anicom's 1998 and 1999 financial statements. Indeed, PwC certified that Anicom's financial statements were accurate, complete and in conformity with Generally Accepted Accounting Procedures ("GAAP") and that its audits were performed according to Generally Accepted Accounting Standards ("GAAS").

On July 18, 2000, Anicom announced that it was investigating possible accounting irregularities that could result in revision of its 1998, 1999 and first quarter 2000 financial statements by as much as $35 million. Accordingly, Anicom announced that its 1998 and 1999 financial statements should no longer be relied upon.

After conducting an internal investigation, Anicom further announced that, subject to audit, it believed that, for the period from the first quarter 1998 to the first quarter of 2000, the company had overstated revenue by approximately $39.6 million. None of the company's announcements or disclosures ever stated that full-year 1997 revenue or net income had been materially misstated or that any of Anicom's prior financial results were inaccurate in any way.

On January 5, 2001, Anicom filed for bankruptcy protection. The plaintiffs allege that this bankruptcy decreased the value of Anicom stock acquired in the September 1998 transaction, all of which was then owned by the plaintiff, Tricontinental Industries.

After Anicom's disclosure of possible irregularities, both the Securities and Exchange Commission ("SEC") and the Federal Bureau of Investigation ("FBI") conducted investigations. On May 6, 2002, the SEC instituted a civil action against six Anicom officers and employees for violations of the federal securities laws in connection with Anicom's 1998, 1999 and 2000 statements. The SEC complaint alleged that, to conceal this fraud, Anicom executives had lied to PwC during its audits and reviews. Additionally, in 2003, a federal grand jury returned indictments against several of Anicom's executives for fraud and obstruction of justice related to Anicom's 1998, 1999 and 2000 reported results.

## B.  District Court Proceedings

On July 18, 2001, Tricontinental filed this action against PwC and individual officers and directors of Anicom asserting claims related to the September 1998 transaction. The original complaint asserted that PwC had violated Section 10(b) of the Securities Exchange Act for false statements in filings before the SEC; it also asserted common law fraud based on

> materially false and misleading statements . . . concerning the revenues, earnings, operations and financial condition of Anicom. These false and misleading statements were made to Plaintiffs in meetings and conversations in 1998 prior to September 21, 1998 and

were contained in Defendants' various public filings, in the representations and warranties made by Anicom in the Asset Purchase Agreement, and in other documents prepared by Defendants in connection with the Asset Purchase Agreement.

R.1 at 28. Finally, the original complaint alleged a claim for negligent misrepresentation against PwC based on "consent letters it signed for Anicom's" registration statements for the first three quarters of 1998 and based on "its input into the determination of the equity value of the preferred shares," which reflected inflated sales and earnings figures. *Id.* at 29. PwC moved to dismiss these claims on several grounds, and the district court granted that motion.[4]

On January 28, 2003, the plaintiffs filed a motion for reconsideration and also filed a motion for leave to file an amended complaint. The court denied the motion to reconsider, but granted the motion for leave to file an amended complaint ("Amended Complaint"). In the Amended Complaint, Tricontinental asserted two claims against PwC:[5] a negligent misrepresentation claim and a claim for common law fraud. With respect to the negligent misrepresentation claim, the complaint stated that

[p]rior to the time that PwC conducted its 1997 audit, PwC had assisted Anicom in raising money for acquisi-

---

[4] In addition to these counts, the original complaint also alleged several claims against individual employees of Anicom. Neither the claims against Anicom individuals nor the claims against PwC that were contained in the original complaint are before this court.

[5] The Amended Complaint contained additional claims against individuals at Anicom. Those are not before the court.

tions and finding acquisition candidates. And, in 1997, PwC well knew that Anicom was seeking to complete additional acquisitions. Indeed, in December 1997, PwC proposed to provide Anicom with ongoing assistance and advice on acquisitions and acquisition candidates.

R.117 at 63. Additionally, Tricontinental maintained that PwC knew that Tricontinental was relying on Anicom's audited financial statement for 1997 and, specifically, was relying on PwC's representation "that the audit was performed in a manner consistent with GAAS and that Anicom's financial statements conformed with GAAP." *Id.* at 64-65. These statements, Tricontinental alleged, "were materially false, misleading and without reasonable basis." *Id.* at 65. Additionally, Tricontinental claimed that

Anicom's financial statements and Form 10-Qs for the First and Second Quarters of 1998 contained statements that were materially false and misleading. PwC had the responsibility of reviewing those statements and reports before they were released or filed, and PwC did in fact review and provide assurance regarding them. The misstatements in Anicom's financial reports were so blatant that PwC could not have missed them in the course of any reasonable review procedure appropriate to the circumstances known by PwC to exist at the time . . . . Nonetheless, PwC did not withdraw or modify its 1997 audit opinion, but instead PwC let Plaintiffs rely upon that opinion.

*Id.*

The Amended Complaint also included a claim against PwC for common law fraud "Based Upon Actions Taken

After September 21, 1998, To Conceal the Fraud in the Asset Purchase Agreement." *Id.* at 66. Among the allegations against PwC, Tricontinental stated that

[d]uring this period, each of these Defendants participated in a fraudulent scheme to conceal the fraud in the acquisition of Texcan. This scheme consisted of a series of fraudulent activities, including the issuance of fraudulent and misleading audits of Anicom's financial results for the years 1998 and 1999.

. . .

175. Although Plaintiffs did not know that they had a factual basis for rescission, the Principal Individual Defendants and PwC all knew that Plaintiffs had a basis for rescission. PwC and the Principal Individual Defendants also knew that, if the plaintiffs rescinded the Asset Purchase Agreement, the consequences would have been disastrous for all of them. PwC, therefore, joined with the Principal Individual Defendants in a cover-up—a fraudulent scheme designed to ensure that nothing would be made public after the acquisition that would alert Plaintiffs, or anyone else, to the accounting fraud that had occurred at Anicom before the Texcan transaction.

*Id.* at 66-67.

   PwC moved to dismiss the Amended Complaint as well. With regard to the negligent misrepresentation claim, PwC argued that the Illinois Public Accounting Act ("IPAA") "limit[ed] the liability of public accountants to persons," who were "not in privity of contract with them." R.116 at 6. Consequently, because Tricontinental neither had alleged that they "were in privity of contract with PwC at or before the date of the Texcan transaction," nor had

alleged that Anicom's "primary intent" in securing PwC's services was to benefit Tricontinental, Tricontinental had failed to state a claim for negligent misrepresentation consistent with the IPAA. *Id.* at 6-7. With respect to the common law fraud claim, PwC argued that Tricontinental had failed to set forth " 'the who, what, when, where, and how' of the alleged fraud" as required by *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990):

> Plaintiffs allege no facts showing that PwC became aware of material misstatements in the *1997* year-end financial statements. Nor do they allege *how* or *when* PwC supposedly became aware that its opinion on the 1997 financial statements was false. Similarly, plaintiffs allege no facts showing *who* at PwC and Anicom entered into a "scheme" to conceal from plaintiffs that they had a claim to rescind the Texcan transaction, or *when* PwC entered into such a scheme with Anicom. Finally, plaintiffs allege no plausible motive for PwC to commit the fraud alleged in Count V.

R.116 at 11-12 (emphasis in original).

After briefing had closed on PwC's motion to dismiss the Amended Complaint, Tricontinental sought to file a second Amended Complaint to add additional claims against PwC. The plaintiffs' counsel represented to the court that Tricontinental did not intend to change any of the claims that had been set forth in the Amended Complaint. *See* Tr.Vol.III at 8. On September 26, 2003, the district court allowed Tricontinental to file the Second Amended Complaint, but stated that it would decide PwC's pending motion to dismiss the claims contained in the Amended Complaint. *See id.* at 8, 13.

The Second Amended Complaint included two new claims against PwC: a federal securities fraud claim and a

common law fraud claim against PwC both based on allegedly deceptive and untrue statements contained in Anicom's 1997 audit statements. The Second Amended Complaint stated additional allegations against PwC with respect to claims set forth in the Amended Complaint, namely the negligent misrepresentation claim and the common law fraud claim directed at PwC's post-closing actions.

PwC moved to dismiss the new claims contained in the Second Amended Complaint. PwC maintained that the federal securities fraud and common law fraud claims failed to allege "loss causation," a necessary element of both causes of action. PwC also argued that the common law fraud claim was deficient because Tricontinental failed to allege any intent on behalf of PwC to defraud.

On January 29, 2004, the district court dismissed the negligent misrepresentation and fraudulent concealment claims set forth in the Amended Complaint. With respect to the negligent misrepresentation claim, the court held that Tricontinental had failed to allege that PwC owed them any duty in connection with the 1997 audit statement. Turning to the common law fraud claim, the court held that Tricontinental had failed to allege any actionable misrepresentation by PwC after the closing of the September 1998 transaction, that PwC did not have a duty to disclose false or misleading statements by Anicom and that Tricontinental had failed to allege fraudulent intent by PwC.

On February 12, 2004, Tricontinental moved for reconsideration of this order in part because the district court had failed to consider additional allegations contained in the Second Amended Complaint that supported the negligent misrepresentation and post-closing fraud claims.

The district court denied the motion with respect to those counts, specifically rejecting Tricontinental's argument that additional allegations in the Second Amended Complaint helped bolster those claims. The district court stated:

> The plaintiffs exhibit some confusion about which version of the complaint is under consideration. Plaintiffs did not seek leave of court to re-plead Counts IV and V with the support of a sturdier set of alleged facts. They sought leave only to add two supplemental claims, Counts VI and VII. Plaintiffs' counsel assured me in open court that Counts IV and V [negligent misrepresentation and post-closing fraud, respectively] appeared in the Second Amended Complaint "exactly as they were" in the Amended Complaint, and that the proposed amendment presented no obstacle to the then-pending motions to dismiss. Now that those counts have been dismissed, plaintiffs argue that in fact, Counts IV and V are new and improved in the Second Amended Complaint. Contrary to plaintiffs' argument, this court did not fail "to take into account the relationship between the Amended Complaint and the Second Amended Complaint," because the Second Amended Complaint did not "supersede the Amended Complaint" as to Counts IV and V. The new and improved Counts IV and V simply are not before me, because I never permitted them to be changed. Thus, in evaluating Counts IV and V, I evaluate only the versions set forth in the original Amended Complaint.

R.186 at 2-3.

On the same day that the district court denied the plaintiffs' motion to reconsider the dismissal of the claims against PwC contained in the Amended Complaint, the district court also granted PwC's motion to dismiss the claims against it set forth in the Second Amended Com-

plaint. The court held that Tricontinental's securities fraud claim failed because Tricontinental had not alleged loss causation. *See* R.185 at 3. The court further explained that the common law fraud claim failed because "the plaintiffs do not allege that PwC intended to induce action on the part of plaintiffs or anyone else. . . . Here, PwC is not alleged to have intended to mislead anyone at all; the complaint only states that PwC acted 'knowingly.' This is too vague to meet the high pleading standards of Rule 9." *Id.* at 4.

Nearly one year later, Tricontinental filed a motion to vacate the dismissal of the Second Amended Complaint and to replead claims against PwC. The stated rationale for the motion was two-fold. First, Tricontinental pointed to a settlement entered into between PwC partner Gary Seidelman and the SEC; the settlement related to PwC's audit procedures for its 1999 audit of Anicom and its interim review of Anicom's first quarter 2000 financial statements. Second, Tricontinental claimed that an Illinois Appellate Court opinion, *Freeman, Freeman & Salzman, P.C. v. Lipper*, 812 N.E.2d 562 (Ill. App. Ct. 2004), "clarified and, in the concurring opinion altered, the pleading standard governing third party claims against accountants such as those asserted here." R.235 at 2.

The court denied the motion. It held that the information contained in the consent decree neither was new nor did anything "to solve Tricontinental's ongoing failure to plead a viable claim against PwC." R.250 at 4.[6] Further

---

[6] Specifically, the court stated:

> The central issue here is whether PwC had a duty to Tricontinental during the 1998 negotiations that led to the
> (continued...)

more, the district court believed that the recent Illinois Appellate Court decision was "consistent with earlier and subsequent Illinois cases," *id.* at 5; the court concluded that "the argument that *Freeman* . . . requires giving Tricontinental yet another opportunity to replead not only comes too late, it is wrong," *id.* at 6. The district court therefore entered final judgment as to PwC on October 14, 2005. Tricontinental timely appealed.

## II

## DISCUSSION

### A. Standard of Review

We review a district court's dismissal, whether based on Federal Rule of Civil Procedure 12(b)(6) or Rule 9(b), de novo. *See Arazie*, 2 F.3d at 1464-65. In reviewing dismissals, "[w]e accept all the factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff." *Id.* at 1465 (citation omitted). In doing so, however, "[w]e are not required . . . to ignore any facts alleged in the complaint that undermine the

---

[6] (...continued)

> sale of the Anicom securities to speak up concerning accounting irregularities PwC may have discovered during its audit of Anicom's 1997 financial statements. I have repeatedly held that it did not. The consent decree does not address any problems encountered in PwC's audit of the 1997 Anicom statement. It does not even mention that statement, but is concerned only with PwC's involvement in financial statements that were generated *after* the sale.

R.250 at 4 (emphasis in original).

plaintiff's claim." *Id.* (citation omitted). Although we employ the same standard of review for dismissal under Rule 9(b),

> [t]he federal rules impose more stringent pleading requirements upon complaints charging fraud than on complaints charging other types of misconduct. Fed. R. Civ. P. 9(b). We outlined these requirements in *DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir.), *cert. denied*, 498 U.S. 941 (1990). In *DiLeo*, we held that plaintiffs must plead the circumstances constituting fraud in detail—the "who, what, when, where, and how . . . ." *Id.* at 626.

*Arazie*, 2 F.3d at 1465 (parallel citations omitted). This heightened pleading requirement does not extend to "states of mind" which "may be pleaded generally" under Rule 9(b), *see Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1127 (7th Cir. 1990); nevertheless, the complaint " 'must still afford a basis for believing that plaintiffs could prove scienter,' " *id.* (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990)).[7] Finally, we note that we may affirm

---

[7] In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified at 15 U.S.C. § 78u-4), which placed an even greater burden on the plaintiff with respect to pleading federal securities claims. *See* 15 U.S.C. § 78u-4(a)(1) (stating that the provisions contained in "this subsection shall apply in each private action arising under this chapter," specifically Chapter 2B of Title 15 of the United States Code). The PSLRA affected the manner in which a plaintiff must plead facts related to an allegedly untrue or misleading statement, *see* 15 U.S.C. § 78u-4(b)(1), and related to the defendant's scienter, *see* 15 U.S.C.

(continued...)

the judgment of the district court on any ground sup-
ported by the record. *See Vargas-Harrison v. Racine Unified
Sch. Dist.*, 272 F.3d 964, 974 (7th Cir. 2001).

**B. Negligent Misrepresentation**

Tricontinental first maintains that the district court erred
in dismissing its negligent misrepresentation claim on the
ground that it "lacked privity with PwC and that PwC
made no direct representation to Tricontinental." Appel-
lants' Br. at 26. In Tricontinental's view, neither of the
elements mentioned by the district court are necessary
to state a claim under Illinois law. We therefore must
examine the necessary elements of a negligent misrepresen-
tation claim under Illinois law. This claim is *not* governed
by the heightened pleading standard of Rule 9(b).

**1.**

In order to state a claim for negligent misrepresenta-
tion under Illinois law, a party must allege:

> (1) a false statement of material fact; (2) carelessness or
> negligence in ascertaining the truth of the statement
> by the party making it; (3) an intention to induce the
> other party to act; (4) action by the other party in
> reliance on the truth of the statement; (5) damage to the
> other party resulting from such reliance; and (6) a duty

---

[7] (...continued)
§ 78u-4(b)(2). Although applicable to Tricontinental's federal
securities claim, the PSLRA does not affect directly any of the
issues raised in this appeal.

on the party making the statement to communicate accurate information.

*First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 334-35 (Ill. 2006).

The Illinois courts have considered, on several occasions, the application of these requirements, specifically, the element of duty, as it applies to public accountants. The Illinois Appellate Court first spoke to this issue in *Brumley v. Touche, Ross & Co.*, 463 N.E.2d 195 (Ill. App. Ct. 1984) ("*Brumley I*"). In that case, the court reviewed the various approaches that courts around the country had adopted for accountant liability to third parties: (1) the standard set forth in *Ultramares Corp. v. Touche*, 174 N.E. 441 (N.Y. 1931), which held that public accountants could not be liable in negligence to third parties absent privity, *see Brumley I*, 463 N.E.2d at 198; (2) a reasonable foreseeability standard; and (3) a more limited foreseeability rule "that public accountants may be liable to plaintiffs, who are not exactly identifiable, but who belong to a limited class of persons whose reliance on the accountant's representations is specifically foreseen," *id.* at 199. After reviewing these options, the court also looked to the circumstances under which the Supreme Court of Illinois had held other professionals, specifically surveyors and attorneys, responsible to third parties. *See Rozny v. Marnul*, 250 N.E.2d 656 (Ill. 1969) (surveyors); *Pelham v. Griesheimer*, 440 N.E.2d 96 (Ill. 1982) (attorneys). The court stated:

> In *Rozny v. Marnul* the court extended a duty to a surveyor premised upon the pleadings and proof of an absolute guarantee of accuracy made by the surveyor on the inaccurate plat; defendant's knowledge that the plat would be used and relied upon by others than the person ordering it, including plaintiff; that poten-

tial liability in the case was restricted to a small group; and, that permitting recovery by a reliant user whose use of the plat was foreseeable will promote caution by surveyors. In that case, the surveyor's guarantee of accuracy was absolute and the intended reliance upon the plat by the third-party was known to him.

*Brumley I*, 463 N.E.2d at 200. Turning to the holding of the state supreme court with respect to attorney liability, the appellate court recounted that, in *Pelham*,

the court determined there could be a duty owed by an attorney to a third-party who was not his client, thus providing a broader scope of liability in a negligence action than privity. There, the test of the scope of an attorney's duty to a third-party was whether the attorney was acting at the direction of or on behalf of his client to benefit or influence a third-party. . . .

*Id.* The appellate court concluded that "a similar rule" to the rule applied to attorney liability "[wa]s appropriate" for determining "the duty owed to third-parties by an accountant." *Id.* Applying the *Pelham* rule, the appellate court held that the plaintiff's complaint was "insufficient to set forth a duty on the part of defendant to plaintiff" because "[t]he complaint d[id] not allege Touche Ross knew of plaintiff or that the report was to be used by KPK to influence plaintiff's purchase decision nor does it allege that was *the primary purpose and intent* of the preparation of the report by Touche Ross for KPK." *Id.* (emphasis added).

In *Brumley v. Touche, Ross & Company*, 487 N.E.2d 641 (Ill. App. Ct. 1985) ("*Brumley II*"), the court revisited this standard. In *Brumley II*, the plaintiff had argued that the

Supreme Court of Illinois had altered the standard for
liability for attorneys, which necessitated a change by the
appellate court with respect to accountant liability. The
appellate court rejected this argument:

> Plaintiff contends, however, that our supreme court
> has modified the *Pelham* view in such cases, citing
> *Ogle v. Fuiten* (1984), 102 Ill.2d 356, 80 Ill. Dec. 772, 466
> N.E.2d 224, and argues that the "intent to directly
> benefit" standard as to attorneys applies only in
> adversarial representation matters, as in *Pelham*, and
> not where the matter is nonadversarial, as in the
> drafting of wills in *Fuiten*. Plaintiff suggests that as the
> relationship between accountant and client does not
> relate to adversarial matters, that a less direct stan-
> dard would also apply here. . . .
>
> We do not agree the supreme court has rejected or
> modified the "primary intent" rule stated in *Pelham* to
> be essential to establish a duty on the part of an attor-
> ney towards a nonclient for professional negligence.
> In *Fuiten*, plaintiffs alleged, *inter alia*, that the ser-
> vices of the defendant attorney employed by testators
> to draft their wills was obtained for the benefit of
> plaintiffs as the intended beneficiaries of the wills. It
> is thus apparent that the standard applicable to the
> attorney-client-third-party relationship remains as
> stated in *Pelham*.
>
> If, as we have held, a similar standard should apply
> in a tort action by a third party against an accountant,
> it is apparent that to be sufficient plaintiff's complaint
> must allege facts showing that *the purpose and intent
> of the accountant-client relationship* was to benefit or
> influence the third-party plaintiff. Plaintiff has al-
> leged that at the time he was preparing to make an

offer to purchase the stock, representatives of KPK Corporation furnished to him auditing reports earlier prepared for KPK by defendant Touche, Ross. Plaintiff also alleged that he advised Touche, Ross of his interest in acquiring KPK stock and that the reports prepared by defendant had been submitted to plaintiff for the purpose of influencing his stock purchase decision. The complaint further alleged Touche, Ross knew he was using the reports to formulate an offer for the stock and that defendant confirmed to plaintiff that its auditing report accurately reflected the financial position of its client KPK.

487 N.E.2d at 644-45 (citations omitted; emphasis added).

Shortly after *Brumley II*, the Illinois legislature enacted the Illinois Public Accounting Act, 225 ILCS 450/30.1, which provides:

No person, partnership, corporation, or other entity licensed or authorized to practice under this Act . . . shall be liable to persons not in privity of contract with such person, partnership, corporation, or other entity for civil damages resulting from acts, omissions, decisions or other conduct in connection with professional services performed by such person, partnership, corporation, or other entity, except for:

(1) such acts, omissions, decisions or conduct that constitute fraud or intentional misrepresentations, or

(2) such other acts, omissions, decisions or conduct, if such person, partnership or corporation was aware that a primary intent of the client was for the professional services to benefit or influence the particular person bringing the action; provided, however, for the purposes of this subparagraph (2), if such person,

partnership, corporation, or other entity (i) identifies in writing to the client those persons who are intended to rely on the services, and (ii) sends a copy of such writing or similar statement to those persons identified in the writing or statement, then such person, partnership, corporation, or other entity or any of its employees, partners, members, officers or shareholders may be held liable only to such persons intended to so rely, in addition to those persons in privity of contract with such person, partnership, corporation, or other entity.

225 ILCS 450/30.1. Following IPAA's passage, there was some question regarding the effect of the IPAA on accountant liability. One commentator read the IPAA, specifically the proviso in subsection 2 ("provided, however, for the purposes of this subparagraph (2) . . .") as making "it effectively impossible for any person not in privity of contract to sue the public accountant for negligent misrepresentation." Michael J. Polelle, *Accountants' Privity Shield: An Illinois Mistake*, 38 DePaul L. Rev. 685, 686 (1989). A district court in this circuit, after consulting the legislative history of the provision, construed the statute as permitting an accountant not in privity with the third party to be liable to that third party for negligent misrepresentation only when the accountant had given written notice to the party. *See Robin v. Falbo*, 1992 WL 188429 (N.D. Ill. 1992). We are obliged, however, to follow the interpretation given the language by the state appellate courts, and the interpretation given in *Robin* was rejected by the Illinois Appellate Court in *Chestnut Corp. v. Pestine, Brinati, Gamer, Ltd.*, 667 N.E.2d 543, 546-47 (Ill. App. Ct. 1996). The Illinois court took the view that the first clause of subparagraph (2) states the general rule of accountant liability

as set out in *Brumley* while the second clause creates a legislative exception to the general rule. Continued the court:

> [T]o adopt the defendants' interpretation of the statute would require us to hold, as a matter of law, that accountants are never liable to third parties, absent fraud or intentional misrepresentation, unless they agree in writing to expose themselves to liability. The law in Illinois would have come full circle then and returned to the rational [sic] of *Ultramares* in 1931. Absent a clear signal from the legislature or the supreme court that such a return is intended, we believe the observation of the trial court and the evolution of the law since *Ultramares* provides a useful background as one measures the statute's meaning.

*Id.* at 547.

Although the Supreme Court of Illinois has not spoken to the issue, Illinois Appellate Courts seem to agree that the IPAA embodies the rule as first set forth in *Pelham* and as applied to accountants in *Brumley II*: The plaintiff must show that a primary purpose and intent of the accountant-client relationship was to benefit or influence the third-party plaintiff. *See Chestnut Corp.*, 667 N.E.2d at 547; *Brumley II*, 487 N.E.2d at 645.

The primary intent rule, however, has proven to be somewhat difficult to define in practical terms. For instance, disputes have arisen regarding whether the "primary intent" of the client must be contemporaneous with the accountant's work product on which the third party relies. With respect to this issue, the Illinois Appellate Court has stated:

In terms of timing, we do not read the statute to strictly require that an accountant be made aware of his client's intention to influence or benefit a third party only at the time the work product was created as defendant contends.

The standard announced in *Pelham* requires that a plaintiff "prove that the primary purpose and intent of the client . . . was to benefit or influence the third party." . . . In *Brumley II,* we held that the plaintiff in that case met the *Pelham* standard because he alleged that the defendant knew of the plaintiff's reliance on the defendant's reports and that the defendant had subsequently verified its accuracy. We do not, however, read *Brumley II* as *per se requiring independent verification* in order to meet the standard in *Pelham. Other conduct* may be sufficient to satisfy *Pelham.*

*Builders Bank v. Barry Finkel & Assocs.,* 790 N.E.2d 30, 37 (Ill. App. Ct. 2003) (emphasis added).

Further, although Illinois case law has established that "independent verification" is not a per se requirement, Illinois courts have not set forth in detail what "other conduct," *id.,* may satisfy the "primary intent" standard. The cases, however, do establish that *some* affirmative action on behalf of the defendant-accountant is necessary. For instance, in *Builders Bank*, the record indicated

that Finkel [the accountant] was told by Urkov [the company owner] that UMC was applying for a loan and requested that financial statements be furnished to plaintiff. The record further establishes that Finkel personally met with plaintiff on two occasions to discuss issues related to the loan. In at least one meeting, UMC was seeking an increase of $200,000 on a

loan that had already been approved. In our view, it is reasonable to infer that Finkel played an active role in securing the loan or increasing the loan amount for UMC. From this evidence, a finder of fact could conclude, pursuant to the statute, that defendant knew its work was being used to influence plaintiff at least at the time of the second meeting and that defendant, at minimum, presented its work as accurate.

*Id.* Similarly, in *Freeman, Freeman & Salzman, P.C. v. Lipper*, 812 N.E.2d 562 (Ill. App. Ct. 2004), the court held that the standard had been met by the allegation that the accountant to an investment fund had "issued clean audit opinions on each investment partner's capital accounts for those years"; had "addressed and sent its clean audit opinions to the partners who invested in those funds, including plaintiffs"; and had "prepared federal income tax Schedules K-1 for plaintiffs and the limited partners each year." *Id.* at 566-67. Furthermore, "each Schedule K-1 purported to reflect each partner's proportionate share of the partnership's net income for the year, as well as each partner's capital account balance at the beginning and end of each year." *Id.* at 567. Finally, in *Chestnut Corp.*, the court held that the plaintiffs had stated a claim for negligent misrepresentation by alleging that the plaintiff's representatives had gone to the offices of the defendant-accountants to discuss their possible investment in the client company and to review its financial condition. In response to specific inquiries by the plaintiff's representatives, the defendants "stated that the audit was accurately performed according to generally accepted auditing standards." *Chestnut Corp.*, 667 N.E.2d at 545.

In sum, the duty owed by a professional accountant to non-client third-parties is the standard articulated in

*Brumley II* and codified in the IPAA. The IPAA provides that an individual accountant, partnership or firm will be liable to a third party for negligence only "if such person, partnership or corporation was aware that a primary intent of the client was for the professional services to benefit or influence the particular person." This "primary intent" may be demonstrated by "independent verification" or by other affirmative actions taken by the accountant and directed to the third party. *See Builders Bank*, 790 N.E.2d at 37.

**2.**

With this standard in mind, we turn to the allegations set forth in the Amended Complaint to determine whether they state a claim for relief.[8] With respect to the

---

[8] In its brief, Tricontinental asks this court to consider allegations contained in the Second Amended Complaint, as well as those contained in the Amended Complaint, in determining whether it has stated a viable claim for negligent misrepresentation. *See* Appellants' Br. at 28-29. Tricontinental acknowledges that, "[b]ecause the district court dismissed this count as alleged in the Amended Complaint, the argument herein relies on citations to allegations contained in the Amended Complaint." *Id.* at 28. However, Tricontinental also states that "the allegations in the Second Amended Complaint prove even more specificity on the threshold issues of PwC's knowledge." *Id.*

We do not believe that the allegations contained in the Second Amended Complaint may be considered with respect to the negligent misrepresentation claim. The district court never granted Tricontinental leave to amend any part of the negligent

(continued...)

negligence claim, we must measure the adequacy of the pleading against the standard set forth in Rule 8 of the Federal Rules of Civil Procedure. That standard, unlike the Illinois standard, is designed simply to give the defendants adequate notice of the allegation made against them. The plaintiffs must set forth "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8.

With respect to the negligent misrepresentation claim, Tricontinental alleged as follows:

> 163. Prior to the time that PwC conducted its 1997 audit, PwC had assisted Anicom in raising money for acquisitions and finding acquisition candidates. And, in 1997, PwC well knew that Anicom was seeking to complete additional acquisitions. . . . PwC most certainly knew that acquisition candidates, such as Plaintiffs, would rely on the 1997 Form 10-K in making their decisions on whether to invest in Anicom's securities.

> 164. PwC knew prior to the closing of the Texcan transaction that Plaintiffs were negotiating to sell significant assets to Anicom in exchange in part for

---

[8] (...continued)
misrepresentation claim. A district court's decision whether to allow a party to amend its complaint is reviewed for an abuse of discretion. *See, e.g.*, *Trustmark Ins. Co. v. Gen. & Cologne Life Re of America*, 424 F.3d 542, 553 (7th Cir. 2005). Tricontinental does not claim that the district court abused its discretion in failing to allow it to amend its negligent misrepresentation claim. Consequently, we evaluate the allegations contained in the Amended Complaint to determine whether the negligent misrepresentation claim survives PwC's Rule 12(b)(6) challenge.

Anicom securities. PwC was on the circulation lists for drafts of the Asset Purchase Agreement and PwC conducted due diligence of Texcan for Anicom. . . . PwC knew that Plaintiffs had received and were relying on Anicom's Form 10-K for 1997 and, in particular, PwC's unqualified audit report, and that Anicom intended that Plaintiffs rely on the 10-K and PwC's audit report in assessing an investment in Anicom . . . . Despite its awareness of these facts, and despite its knowledge from its own investigation and its involvement in the business of Anicom that Anicom was engaged in improper accounting practices and lacked adequate controls to prevent these irregular practices, PwC intentionally or recklessly failed to withdraw its audit opinion on the 1997 financial statements. Instead, PwC allowed Plaintiffs to rely on the false and misleading information contained in Anicom's Form 10-K for 1997.

R.117 at 63-64.

As noted by the district court, these allegations do not demonstrate any "independent verification" provided by PwC to Tricontinental. *Builders Bank*, 790 N.E.2d at 37. However, such verification to the third party is not a per se requirement. *See id*. "Other conduct" by PwC directed to Tricontinental also may satisfy the "primary intent" requirement of the IPAA. *See id.* Tricontinental alleges that PwC knew of its reliance on the 1997 audit opinion, knew of the misrepresentation contained in the statement and "allowed plaintiffs to rely on the false and misleading information." R.117 at 64. However, Illinois cases, fairly read, make clear that the IPAA requires more. In order to state a claim under the IPAA, Tricontinental must allege that it was a primary purpose "of the accountant-

client relationship . . . to benefit or influence" Tricontinental. None of the allegations contained in the above-recited paragraphs support such an inference. Indeed, the opposite appears to be the case. The actions taken by PwC—assisting Anicom in raising money for acquisitions, conducting due diligence "for Anicom" and being included on the circulation lists during the transaction—are examples of Anicom's use of PwC's services for its own benefit, not that of Tricontinental. Consequently, although we agree with Tricontinental that neither privity nor independent verification need to be asserted or shown in order to state a claim, Tricontinental must set forth "a short and plain statement of the claim showing that [it] is entitled to relief." Fed. R. Civ. P. 8(b). Absent an allegation that fairly states that Anicom's primary intent in retaining and utilizing PwC's services and work product during the transaction was to influence Tricontinental, or absent factual allegations that support such an inference, Tricontinental has not stated a claim for negligent misrepresentation under Illinois law.[9] We, therefore, affirm the district court's dismissal of this claim.[10]

---

[9] We do not believe that the vague, conclusory allegation that PwC "participated in the negotiations" between Tricontinental and Anicom is a sufficient allegation that PwC made a sufficient representation to Tricontinental to satisfy this requirement.

[10] PwC also argues that Tricontinental's negligent misrepresentation claim should fail for another reason: Tricontinental did not plead adequately loss causation. As noted above, however, Tricontinental's negligent misrepresentation claim must be evaluated according to the pleading requirements of Rule 8, not the heightened pleading requirements of Rule 9. Evaluated

(continued...)

---

[10] (...continued)
according to this less stringent standard, we believe that Tricontinental's allegations that it relied on the 1997 statement to its detriment, that the statement allegedly failed to reveal an historic overstatement of income (a practice which allegedly continued through 1998 and 1999), and that Anicom's stock was delisted in 2000 after deficiencies in the 1998 and 1999 financial statements were revealed, adequately allege loss caused by PwC's purported negligence with respect to the 1997 financial statement.

PwC also maintains that

the Amended Complaint does not allege that Tricontinental Distribution suffered any loss at all since it transferred all of its Anicom stock to Tricontinental Industries in November 1998, long before the stock declined in value. As for Tricontinental Industries, it was not a party to the [Agreement] and thus could not have relied on PwC's 1997 opinion in deciding "to enter into" that agreement.

Appellee's Br. at 25.

We agree with PwC that, if Tricontinental Industries had compensated fully Tricontinental Distribution for its Anicom stock prior to the time that Anicom made its disclosure in July 2000, then Tricontinental Distribution likely did not suffer any loss based on its own reliance on the 1997 audit opinion. Furthermore, if the facts establish that Tricontinental Industries was not involved in the merger negotiations and did not rely on PwC's audit statement in making its own corporate restructuring decisions, then, again, it is not entitled to recovery. However, under Rule 8, "[a] claim may be dismissed only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Here, if the facts

(continued...)

## C. Post-Closing Common Law Fraud

Tricontinental also maintains that the district court erred in dismissing Count V of the Amended Complaint, entitled "For Common Law Fraud, Based Upon Actions Taken After September 21, 1998, To Conceal the Fraud in the Asset Purchase Agreement." R.117 at 66. This count alleges that, during the period after the sale and until July 18, 2000, "each of these Defendants participated in a fraudulent scheme to conceal the fraud in the acquisition of Texcan. This scheme consisted of a series of fraudulent activities, including the issuance of fraudulent and misleading audits of Anicom's financial results for the years 1998 and 1999." *Id.* Tricontinental also alleges that

> [b]ecause these irregularities were deliberately and knowingly hidden from Plaintiffs in September of 1998, Plaintiffs were fraudulently induced to enter into the Asset Purchase Agreement. Because their sale of valuable assets was the result of fraud, Plaintiffs were entitled to rescind the Asset Purchase Agreement under both the common law of Illinois and under the Illinois Securities Act, 815 ILCS 5/13, *et seq.*, and would have done so, but for the Defendant's post-closing fraudulent conduct and concealment.

*Id.* at 67. Finally, Tricontinental avers that

---

[10] (...continued)

show, as explained by Tricontinental, that "[t]he intra-company stock transfer was not a separate transaction, but the final step of the overall transaction, in which Tricontinental Industries was involved at every step," Reply Br. at 4, then, we believe, Tricontinental may be entitled to relief. Consequently, we cannot uphold the district court's dismissal of the negligent misrepresentation claim on this basis.

> [b]ecause of the Defendants' material misrepresentations in connection with the 1998 and 1999 audits, and because of Plaintiffs' reliance upon those misrepresentations, Plaintiffs did not discover that they had been fraudulently induced to enter into the Asset Purchase Agreement until July of 2000, at which time recission of the Texcan transaction would not have prevented the losses that Plaintiffs suffered from Defendants' fraud.

*Id.* at 68.[11]

The district court treated Tricontinental's claim as a claim for "fraudulent concealment" and held that Tricontinental had not met the heightened pleading requirement of Rule 9(b):

> To satisfy this requirement, Tricontinental must plead the "who, what, when, where, and how" involved in the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Tricontinental does not meet this burden. Nothing in the pleadings before me alleges with this degree of particularity the representations made by PwC after Tricontinental's stock purchase. Tricontinental does allege omissions on the part of PwC. However, as discussed in my previous memorandum opinion . . ., PwC had no duty to reveal misleading statements on the part of its clients.

R.169 at 3-4. The district court also determined that Tricontinental had not pleaded adequately the scienter requirement. *Id.*

---

[11] As with its negligent misrepresentation claim, Tricontinental invites this court's attention to allegations contained in the Second Amended Complaint as well as in the Amended Complaint. For the reasons set forth supra note 8, we shall consider only those allegations set forth in the Amended Complaint.

Tricontinental takes issue with these conclusions. Although acknowledging that PwC had no independent duty to reveal any fraud contained in the 1997 audit statement—Tricontinental nevertheless maintains that PwC did have an independent duty to conduct the 1998 and 1999 audits with care and to be truthful in those audit statements. Its failure to do so, Tricontinental maintains, constituted fraud. Turning to the scienter requirement, Tricontinental alleges that PwC was aware of substantial billing improprieties during 1998 and 1999, and yet gave no indication of these problems in the 1998 and 1999 financial statements and audits. Tricontinental further alleges that PwC's failure to reveal these problems was fueled by its desire to maintain a good business relationship with Anicom. Taken together, Tricontinental believes that these allegations suffice to establish intent to defraud.

Generally speaking, a claim for fraud must include the following elements: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996). Here, the critical element is whether the facts alleged in the Amended Complaint, and the reasonable inferences taken from those facts, permit the conclusion that PwC's allegedly false statements in 1998 and 1999 were made with the intent to induce Tricontinental not to seek rescission.

We do not believe that Tricontinental has met this pleading requirement. This court has stated that, with respect to allegations of scienter in cases of fraud against accountants, the complaint should identify what the

accountant had to gain by covering up (or being complicit in) the fraud of their clients. *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990). Typically, an accountant's interest in fees, standing alone, will not suffice to establish fraudulent intent. *See id.* ("An accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees for two years' audits could not approach the losses E & W would suffer from a perception that it would muffle a client's fraud."); *see also GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 238 (3d Cir. 2003) ("[P]laintiffs now argue that CSFB had a motive to commit fraud because it stood to receive underwriting and financial advisory fees. This allegation is undoubtedly true but equally unavailing."); *Fisher v. Offerman & Co.*, 1996 WL563141, at *7 (S.D.N.Y. 1996) ("[A]n underwriter's alleged motive to earn its underwriting fees is not alone sufficient to sustain a strong inference of fraudulent intent. If it were, every underwriter, law firm, accountant, and investment advisor whose compensation or commission depended on the completion of an initial public offering would have a motive to commit fraud, which would make Rule 9(b) wholly meaningless."). PwC's alleged interest in generating fees, however, is the crux of Tricontinental's scienter argument.

Additionally, we are troubled by the tenuous relationship between the alleged motivation for the inducement—the desire for continued fees—and the action that PwC allegedly was trying to induce—Tricontinental not seeking rescission. Essentially, Tricontinental argues as follows: If PwC's statements had revealed Anicom's allegedly fraudulent billings, Tricontinental would have sought rescission

against Anicom.[12] Upset by this action, Anicom, in turn, would have terminated its relationship with PwC. As a result of Anicom's displeasure, PwC would have lost the fees generated by its relationship with Anicom. We believe that this theory of motive involves too many assumptions and too much speculation to support a *reasonable* inference that PwC made false statements with respect to the 1998 and 1999 financial statements *for the purpose of inducing Tricontinental not to seek rescission.* Consequently, we affirm the judgment of the district court with respect to Tricontinental's common law fraud claim based on PwC's post-closing statements.

## D. Securities Fraud

Tricontinental further argues that the district court erred in dismissing Count VI of the Second Amended Complaint, which set forth a federal securities claim against PwC. Specifically, Tricontinental alleged that PwC violated 15 U.S.C. § 78j(b) and implementing Rule 10b-5 when PwC made material misrepresentations in the 1997 audit statement which induced Tricontinental to purchase Anicom stock as part of the Agreement.

In order to state a claim for a private cause of action under Rule 10b-5, a plaintiff must allege: "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Caremark, Inc. v. Coram Healthcare*

---

[12] There is no question that Tricontinental does not have a direct right of rescission against PwC.

*Corp.*, 113 F.3d 645, 648 (7th Cir. 1997). With respect to 10b-5 causes of action, causation has two necessary components: "transaction causation" and "loss causation." *Id.* "To plead transaction causation, the plaintiff must allege that it would not have invested in the instrument if the defendant had stated truthfully the material facts at the time of the sale." *Id.* "To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries." *Id.*

The district court determined that Tricontinental had not pleaded adequately loss causation because the drop in Anicom's stock followed "the public revelation of misstatements in Anicom's 1998 and later financial statements and its subsequent bankruptcy filing," and "not by public exposure of the 1997 fraud," which induced the transaction. R.185 at 3. According to Tricontinental, this conclusion ignores the fact that the 1997 fraud was part of an on-going scheme to overrepresent revenue and that the 1998 audit relied in part on historic information. Consequently, Tricontinental submits, the public revelation of the 1998 fraud which caused the reduction in stock price suffices to allege loss causation.

We do not believe that Tricontinental's position can be reconciled with the Supreme Court's recent decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). In *Dura*, the plaintiffs alleged that, in reliance on the integrity of the market, they had purchased securities, the price of which had been inflated artificially due to "false statements concerning Dura's drug profits and future Food and Drug Administration (FDA) approval of a new asthmatic spray device." *Id.* at 339. The Supreme Court held that this allegation did not plead adequately the plaintiffs' loss for purposes of 10b-5. The Court ob-

served that, because 10b-5 actions rested largely on common law causes of action for misrepresentation and deceit, damage proximately following from the deception is an important element. *See id.* at 343-44. Relying in part on the Restatement (Second) of Torts, the Court noted that liability only attaches when "a person who 'misrepresents the financial condition of a corporation in order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts . . . become generally known' and 'as a result' share value 'depreciate[s].' " *Id.* at 344 (quoting Restatement (Second) of Torts § 548, cmt. b). The allegations of the complaint, as well, must set forth "the economic loss and proximate cause" for which the plaintiff seeks recovery:

> The statute insists that securities fraud complaints "specify" each misleading statement; that they set forth the facts "on which [a] belief" that a statement is misleading was "formed"; and that they "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u-4(b)(1), (2). And the statute expressly imposes on the plaintiffs "the burden of proving" that the defendant's misrepresentations "caused the loss for which the plaintiff seeks to recover." § 78a-4(u)(4).
>
> The statute thereby makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss.

*Dura*, 544 U.S. at 345.

Tricontinental acknowledges the holding of *Dura*, but maintains that *Dura* does not require the precision in

pleading required by the district court: "Nowhere in *Dura* does the Supreme Court require that the precise fraud that resulted in the underlying transaction be the subject of a later corrective disclosure in order to satisfy loss causation. And nowhere does *Dura* require any allegation about the market's thought process in responding to a corrective disclosure." Reply Br. at 20.

We cannot accept this rendition of *Dura*'s requirements. *Dura* stresses that the complaint must "'specify' each misleading statement," *Dura*, 544 U.S. at 345, and that there must be "a causal connection between the material misrepresentation and the loss," *id.* at 342, not simply that the misrepresentation "'touches upon' a later economic loss," *id.* at 343.

In the present case, therefore, Tricontinental had to allege that PwC's 1997 audit contained a material misrepresentation which caused Tricontinental to suffer a loss when that material misrepresentation "became generally known." Tricontinental, however, has not identified any statements by Anicom or PwC that made "generally known" any problems or irregularities in the 1997 audited financial statement. The only statement identified by Tricontinental was Anicom's statement in 2000 concerning its 1998 and 1999 financial statements. Tricontinental maintains that Anicom's additional revelation in July 2000—that it was investigating certain "accounting irregularities"—suggested that Anicom's 1997 financial statement also was questionable. However, it is clear that the reference to "accounting irregularities," as used in Anicom's statement in July 2000 and recounted in the Second Amended Complaint, was limited to Anicom's 1998 and 1999 financial statements. R.135 at 43.

Tricontinental has alleged only that it experienced loss as a result of the exposure of misrepresentations contained in Anicom's 1998 and 1999 financial statements, statements issued after the Agreement was signed. These allegations are not sufficient to state a claim under 10b-5 for losses suffered as a result of alleged misrepresentations in the 1997 audited financial statement. Consequently, the district court did not err in dismissing Tricontinental's 10b-5 claim.

### E. Pre-Closing Common Law Fraud

Finally, Tricontinental maintains that the district court erred in dismissing its claim for common law fraud based on misrepresentations made by PwC in its audit opinion related to Anicom's 1997 financial statement. Although we agree with the district court that Tricontinental's scienter allegations are problematic, we believe that Tricontinental's claim for pre-closing fraud suffers from a more fundamental infirmity. As we explained in *DiLeo*, Rule 9(b) "requires the plaintiff to state 'with particularity' any 'circumstances constituting fraud.' . . . This means the who, what, when, where, and how . . . ." 901 F.2d at 627. Here, Tricontinental's claim falls short with respect to the last requirement: Tricontinental does not allege how PwC's fraud caused its losses.

The Supreme Court of Illinois has stated that Illinois law is "similar to the analysis used by these Federal courts which require both transaction causation and loss causation in order to recover for misrepresentation in securities cases." *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 747 (Ill. 1994). The plaintiff, the court noted, is required to show that " 'the untruth was in some reasonably direct,

or proximate, way responsible for his loss.' " *Id.* (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981). However, one could not reasonably infer from Tricontinental's pre-closing claim that the losses it suffered after Anicom's statement in July 2000 were caused by the alleged misrepresentation in the 1997 audit statement. Tricontinental's loss followed Anicom's revelation that it was investigating irregularities in its 1998 and 1999 financial statements. However, Tricontinental has not set forth any facts showing that the losses it suffered are proximately linked to the alleged misstatements in the 1997 financial statement.

Tricontinental's allegations focus on its detrimental reliance on the 1997 statement, which is at the heart of transaction causation. However, both transaction and loss causation are elements of fraud under Illinois law. Because Tricontinental did not plead adequately loss causation, its pre-closing fraud claim must fail.[13]

---

[13] Additionally, as noted above, we agree with the district court that Tricontinental's allegations with respect to scienter also fall short of the mark. Before this court, Tricontinental maintains that the district court required it to plead elements of scienter and intent with particularity—elements which, even under Rule 9(b), may be pleaded generally. Tricontinental submits that, if the district court had applied the proper standard in evaluating the allegations in the Second Amended Complaint, namely whether the complaint affords a basis for believing that the plaintiff could establish scienter, the district court would have concluded that the allegations provide a basis for believing that PwC acted with scienter in issuing its 1997 audit opinion. *See* Appellant's Br. at 34.

PwC contends, however, that the district court's dismissal of this count was proper because Tricontinental failed to allege

(continued...)

---

[13] (...continued)
that it was PwC's "intent that the statement induce the plaintiff to act" that dooms the claim. *See* Appellee's Br. at 43-46. According to PwC, the plaintiffs "did not allege that PwC issued its 1997 audit opinion with the intent to induce the Texcan Entities to enter into that transaction, nor did plaintiffs allege that PwC issued its opinion with the intent to induce Tricontinental Industries to acquire Anicom stock from Texcan Entities in some later corporate transactions." *Id.* at 44.

Tricontinental argues in reply that it "satisfied its pleading obligation by alleging that PwC had a reason to expect that its audit report would be communicated to companies targeted by Anicom." Reply Br. at 15-16. Tricontinental points to the Restatement (Second) of Torts § 533, comment g, as support for its position. Comment g states that " 'if a firm of accountants employed to audit the books of a corporation gives a certificate fraudulently overstating its assets, knowing that the corporation intends to make use of it to obtain a loan, it is immaterial that the identity of the prospective lender is not know [sic] to the accountants.' " *Id.* at 16 (quoting Restatement (Second) of Torts § 533, cmt. g).

We believe Tricontinental's reliance on the Restatement is misplaced. Tricontinental has not shown that Illinois follows the Restatement with respect to this requirement. Indeed, Tricontinental's argument seems to run afoul of the state supreme court's articulation of the elements of common law fraud found in *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996), one of which is "defendant's intent that the statement induce *the plaintiff* to act." (emphasis added). In the absence of some evidence that Illinois courts would abandon this requirement in favor of the Restatement position, we must reject Tricontinental's argument.

## Conclusion

For the reasons set forth above, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*